**BROAD STREET FOOD MARKET, INC.**

v.

**UNITED STATES of America.**

**Civ. A. No. 81–0756 S.**

United States District Court,
D. Rhode Island.

Feb. 3, 1983.

---

Thomas Quinn, Jr., Providence, R.I., for plaintiff.

Lincoln C. Almond, U.S. Atty. by Robert L. Gammell, Asst. U.S. Atty., Providence, R.I., for defendant.

SELYA, District Judge.

Plaintiff, Broad Street Food Market, Inc. ("Market"), challenges a one year disqualification from participation in government's Food Stamp Program. Disqualification resulted from a determination of the Food and Nutrition Service of the United States Department of Agriculture ("FNS") that plaintiff had allowed ineligible, non-food items to be purchased with food stamps in violation of the Food Stamp Act. 7 U.S.C. §§ 2011 *et seq.* (the "Act"). Thereupon, plaintiff instituted this action, claiming a trial de novo before this Court. Plaintiff obtained a judicial stay of the suspension imposed by FNS, *pendente lite.* The case was reached for trial in this Court on January 25, 1983.

**I.**

Section 2023 of the Act provides that the suit in federal district court:

> shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue. If the court determines that such administrative action is invalid, it shall enter such judgment on order as it determines is in accordance with the law and the evidence.

7 U.S.C. § 2023.

While the statutory language appears, at first blush, to be commatic, it has produced divergent judicial views as to its meaning, intendment and scope. Some courts have bifurcated the question of violation from the question of sanctions, and have held that the reviewing court lacks jurisdiction to modify or vacate the latter. *Martin v. United States,* 459 F.2d 300 (6th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972);[1] *Josephs v. Government of United States,* 532 F.Supp. 795 (E.D.Pa. 1982). In *Martin,* for example, the court apparently equated the statutory phrase "questioned administrative action" with a determination as to the existence or non-existence of a violation, thus wholly excluding the sanctions imposed from judicial scrutiny if the finding of violation was sustainable. *Martin v. U.S.,* 459 F.2d at 302.

The Fifth Circuit rejected the holding of *Martin* in *Goodman v. United States,* 518 F.2d 505, 510 (5th Cir.1975). There, the court stated:

> [B]y the plain meaning of the term, it would seem that "action" against a guilty party is not complete until a sanction is imposed... Harshness of administrative action necessarily comprehends the imposition of a penalty. By empowering courts to review the agency's final administrative action, Congress granted jurisdiction to review both the determination of violation and the sanctioned period of disqualification.

*Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185, 93 S.Ct. 1455, 1457, 36 L.Ed.2d 142 (1973). *Kulkin v. Bergland,* 626 F.2d 181, 185 n. 7 (1st Cir.1980). *See* discussion *infra.*

---

1. The First Circuit has questioned whether the reasoning in *Martin* supports its conclusion, noting that the cases relied on by the Sixth Circuit apply the deferential standard of review subsequently refined, revised and restated in

*Id.* The Fourth Circuit, too, spurned *Martin,* holding that the constitutional guarantee of due process required judicial review of the sanction as well as the violation. *Cross v. United States,* 512 F.2d 1212, 1217 (4th Cir.1975) (*en banc*).

The rejection of *Martin,* however, was less than all-encompassing. Both the Fourth and Fifth Circuits recognized the force of an underlying rationale of *Martin;* Congress delegated to FNS the power to devise and administer a comprehensive scheme of disqualifications for the effective and efficient administration of the Food Stamp Program. *Id.* at 1218; *Goodman v. United States,* 518 F.2d at 511. FNS, in turn promulgated an extensive regulatory mosaic to this end. *See* 7 C.F.R. § 278.6. Therefore, both the *Goodman* and *Cross* courts acknowledged that the agency's selection of a sanction for a given violation was entitled to great weight. *Id.; Cross v. United States,* 512 F.2d at 1218. Each court accordingly adopted the standard of review set forth in *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457, 36 L.Ed.2d 142 (1973), that "the Secretary's choice of sanction...[is] not to be overturned unless...it [is] 'unwarranted in law or...without justification in fact.' "[2]

The Fourth Circuit's ultimate explication is as follows:

> To be "valid," a sanction must not be arbitrary and capricious, and a sanction is arbitrary and capricious if it is unwarranted in law or without justification in fact. Thus, the scope of review of a sanction is not as broad as the scope of review of the fact of violation.

*Cross v. United States,* 512 F.2d at 1218. *Accord Goodman v. United States,* 518 F.2d at 511–12; *Willy's Grocery v. United States,* 656 F.2d 24 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 1011, 71 L.Ed.2d 301 (1982); *Nowicki v. United States,* 536 F.2d 1171, 1177–78 (7th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1103, 51 L.Ed.2d 537 (1977). If the reviewing court concludes

that the sanction is by this yardstick invalid, the court would be empowered to enter a judgment which "it determines is in accordance with the law and the evidence". *Goodman v. U.S.,* 518 F.2d at 512; 7 U.S.C. § 2023.

In *Kulkin v. Bergland,* 626 F.2d 181, 184–85 (1st Cir.1980), the First Circuit adopted the standard for the review of sanctions applied in *Butz v. Glover Livestock Commission Corp., supra.* Yet in *Kulkin,* the plaintiff introduced at the de novo trial no new evidence which attacked the factual underpinnings upon which the administrative choice of sanction rested. *Id.* at 186. Thus, it was still an open question in this Circuit as to whether a district court should review only the facts before the FNS and determine, from those facts alone, if the sanction "was unwarranted in law or without justification in fact," *e.g., Cross v. United States,* 512 F.2d at 1218, or whether the district court should weigh facts newly emergent in the trial de novo together with the facts in the administrative record in calculating the propriety of the sanction.

*Collazo v. United States,* 668 F.2d 60 (1st Cir.1981) traversed the first leg of this journey. There, the Court of Appeals specifically held that "due process is satisfied when the district court reviews the [FNS] sanction under the *Kulkin* standard even when there are underlying questions of fact regarding the sanction." *Id.* at 66. *Collazo* left open, however, the pivotal question of whether due process requires a full hearing on the factual issues underlying the choice of sanction or whether the district court need only apply the *Kulkin* test to the record as constituted before the administrative agency. *Id.* at 66 n. 10. This case squarely presents that question.

■ While there is respectable support for a contrary view, *e.g.,* K. Davis, *Administrative Law Treatise* § 29.01–8 at 682 (Supp.1976), this Court concludes that, if new evidence regarding the sanction is introduced during the trial de novo, such new

---

**2.** *Butz v. Glover Livestock Commission,* 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973), was brought under the Packers and Stockyards Act, 7 U.S.C. § 181 *et seq.*

evidence must be considered, together with the evidence before the FNS, in determining whether the sanction imposed by the FNS was legally unwarranted or factually unjustified. *Accord Cross v. United States,* 512 F.2d at 1218. To hold otherwise would be to signal a retreat toward the cloister of *Martin,* and to bestow upon the administrative choice of punishment a further immunity from meaningful judicial review which cannot logically be conferred. Both the plain language of the Act and the enlightened approach to the process so clearly suggested by *Kulkin* and by *Collazo* lead inexorably to this result. Elsewise, due process would be at risk, the "trial de novo" terminology chosen by the Congress would be inexplicably truncated by juristic fiat, and the administrative engine would be in a position to outstrip the efficacy of the judicial brake.

As previously discussed, Section 2023 provides that the district court shall hold a *"trial de novo"* to "determine *the validity* of the *questioned administrative action in issue."* 7 U.S.C. § 2023 (emphasis added). The phrase "de novo" means "the court should make an independent determination of the issues." *United States v. First City National Bank of Houston,* 386 U.S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed.2d 151 (1967); *Cross v. United States,* 512 F.2d at 1216 n. 4; *Farmingdale Supermarket, Inc. v. United States,* 336 F.Supp. 534, 536 (D.N.J.1971). The "questioned administrative action in issue" must include the agency's determination of the sanction as well as the violation because the action is not complete until a sanction is imposed. *Goodman v. United States,* 518 F.2d at 510.[3]

Thus, a "trial de novo" of the "questioned administrative action" necessarily

signifies that the reviewing court must be empowered not only to examine the facts underlying such sanction at the administrative level, but also to collect additional facts, and to calibrate the entire panoply of facts before it in balancing the scales on which the validity of the sanction must be weighed. A more atavistic approach would, in the view of this Court, render nugatory the "trial de novo" provision of Section 2023 and would, by a gratuitous act of judge-induced castration, decorporate the statute and thwart the congressional will.[4]

While perhaps supererogative in light of the above, it should also be apperceived that due process considerations likewise militate in favor of a trial de novo on the facts underlying the sanctions as well as on those basilar to the violation. Disqualification would have grave economic consequences for plaintiff, a retailer engaged in business in a depressed economic area where a substantial segment of the public relies on food stamps as the de facto currency for the purchase of groceries. *Cross v. United States,* 512 F.2d at 1217. Since the regulations do not provide for confrontation with accusers, opportunity for cross-examination, or determination by an impartial fact-finder prior to the imposition of sanctions, 7 C.F.R. §§ 278.6 and 279.7, plaintiff would, absent meaningful judicial review, arguably be deprived of a valuable economic interest without a plenary hearing. *See Cross v. United States,* 512 F.2d at 1216–17; *Welch v. United States,* 464 F.2d 682, 685 (4th Cir.1972) (Butzner, J., concurring). Conversely, no additional burdens would be imposed on the government by requiring a reassessment of the sanction following a trial de novo, given that a trial de novo must be held on the violation as well.

---

**3.** The First Circuit impliedly accepted this reasoning when it adopted the *Goodman* and *Cross* standard of review vis-a-vis sanctions. *See Kulkin v. Bergland,* 626 F.2d at 184–85.

**4.** The Court recognizes that its conclusion in this respect may run somewhat athwart some legislative history underlying Section 2023. *See* H.R.Rep. No. 95–345, 95th Cong., 1st Sess. 397–98, *reprinted in* [1977] U.S.Code Cong. & Admin.News 1704, 1941, 2326–27. The cases

implicitly approved by the House Committee, *e.g., Martin v. United States,* 459 F.2d 300 (6th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972), and those impliedly disapproved, *e.g., Goodman v. United States,* 518 F.2d 505 (5th Cir.1975) (*en banc*), are not at such variance with regard to the standard of review, however, that a different result seems fairly to be impelled. *Kulkin v. Bergland,* 626 F.2d at 185–86 n. 10; *see* note 1, *supra.*

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Raso v. Moran,* 551 F.Supp. 294, 300 (D.R.I.1982).

## II.

Having settled, for purposes of this action, that the Court must consider the facts adduced at the trial de novo, as well as those aired administratively before the FNS, in passing upon the propriety of the sanction which has been levied, the Court turns now to the task of determining whether the one year disqualification imposed on plaintiff by the FNS "follow[s] rationally from the facts, [is] authorized by the statute and regulations, and aim[s] toward fulfillment of the Act's purposes." *Collazo v. United States,* 668 F.2d at 66, *citing Cross v. United States,* 512 F.2d at 1217–18.

The FNS premised its choice of sanction on the following facts.

The Market is a grocery store located in a densely populated South Providence neighborhood having a high percentage of black and hispanic residents. Meagre incomes preponderate, and there is widespread dependence on the Food Stamp Program. FNS attention first focused on the Market in 1980 because of an unusually high food stamp redemption rate.

On March 31, 1980, Ms. Anita Eng, a Food Program Specialist with FNS, visited the Market and spoke with Mr. Roberto Ortiz, part-owner of the store. Ortiz assured her that scrupulous adherence to programmatic guidelines was being observed. Ms. Eng reviewed the regulations regarding food stamp transactions with Ortiz, and, in a follow-up letter dated April 2, 1980, reiterated that violations could lead to disqualification from the program.

Plaintiff's rate of redemption relative to other stores in the area continued to escalate, however, and FNS, exercising due vigilance, undertook additional monitoring. FNS agents, posing as customers, used food stamps to purchase prohibited items such as soap, cigarettes and trash bags on five different occasions during October, 1980. Of the forty-seven items sold, twenty-five were ineligible for purchase with food stamps. Mr. Lawrence O'Conner, also part-owner of the Market, participated in each of these proscribed transactions.

By letter dated March 10, 1981, the FNS formally levied charges of program violations. Plaintiff's attorney responded to the charges (by letter dated March 26, 1981), conceding that an occasional forbidden item may have been sold. Plaintiff argued, however, that neighborhood residents dependent on food stamps would suffer if plaintiff was disqualified from the program. Enclosed with plaintiff's response was a petition signed by approximately 400 individuals, which stated, in pertinent part:

> We have been regular customers of the [Broad Street] Market and are dependent upon their merchandise to fulfill our family needs for food and nutrition. A substantial portion of our food purchases are made with food stamps, and if we are unable to redeem our stamps at this store, our entire family will suffer serious hardship . . .

This neighborhood adjuration notwithstanding, FNS notified plaintiff, by letter dated May 12, 1981, that it would be suspended from participating in the Food Stamp Program for a period of one year. Plaintiff thereupon sought administrative review. On November 13, 1981, plaintiff was notified, by letter from Patrick A. Frank, Administrative Review Officer, that the one year disqualification period would stand.

Frank concluded that (i) the charges were supported by substantial evidence; and (ii) since the transgressions occurred without any concomitant refusals to purvey interdicted items, it was store policy to sell ineligible goods in exchange for food stamps. Frank also noted that nine other authorized food stores are located within .6 miles of the Market and that seven of these are owned by persons of hispanic heritage; he singled out a large supermarket, situated within a half-mile of the Market, which held itself out as having "a policy of catering to food preference of ethnic groups." The administrative finding that food stamp

recipients would not be harmed if plaintiff were disqualified was based on this evidence anent the proximity of other authorized food stores to the plaintiff. The sanction followed accordingly.

At the trial de novo in this Court, plaintiff candidly admitted that the administration's decision was supported by substantial evidence as to the charges. The plaintiff did, however, vigorously challenge the imposition of the chosen sanction. Plaintiff argued that because its disqualification would cause dire hardship to food stamp households, § 2021 of the Act required the levying of a money penalty in lieu of disqualification.[5]

In support of its argument, plaintiff presented for the first time at the de novo trial a market study purporting to quantify the adversity which neighborhood residents would suffer if plaintiff were suspended from the program. *Broad Street Market Study,* dated April, 1982, by Ocean State Research Co. (the "Survey"). Defendant stipulated to both admissibility of the Survey and to the preparer's credentials and expertise as a statistician/market researcher. The defendant questioned neither the methodology employed in implementing the Survey, nor its conclusions.

Almost 60% of the sample utilized by the Survey comprised individuals domiciled within three city blocks of the Market. A full 78% of those interviewed said that the Market was the retail food outlet in closest proximity to their homes. 83% stated that they would experience hardship if the Market stopped accepting food stamps. Many respondents had no available transportation, and claimed that other stores were too far to walk, especially when burdened with heavy bags of groceries, or when shopping with small children. The Survey plainly indicated that neighborhood residents would be especially afflicted.

The Survey adequately evinced, further, that many of the other emporia within the purlieu of the Market did not stock certain meats, produce, condiments, frozen and canned goods and the like which were customarily offered for sale by the plaintiff and which were particularly suited to the commensal preferences of the neighborhood census. According to the findings of the Survey, only two stores other than the Market provided neighborhood residents with an equivalent variety of foods and with the resultant ability to accomplish "one-stop" shopping. In addition, the Survey bespoke that it was a commonly-held belief that foodstuffs, especially meat, cost less at the Market than at competing establishments.

### III.

Under the Act and the regulations, a vendor may be disqualified from the Food Stamp Program for a one year period if the evidence shows that "[i]t is the firm's policy to sell expensive or conspicuous non-food items, cartons of cigarettes, or alcoholic beverages, in exchange for food coupons, and the firm has engaged in such policy." 7 C.F.R. § 278.6(e)(2)(A). FNS Instruction 744–9 provides that it may be deemed store policy to perpetrate violations of the program if there is "[s]ubstantial participation by the owner, responsible members of his family, or the management in the violations." *Willy's Grocery v. United States,* 656 F.2d 24, 26 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1011, 71 L.Ed.2d 301 (1982).

Even if the FNS finding that it was plaintiff's policy to sell conspicuous non-food items can be said to follow "rationally from the facts", *Collazo v. United States,* 668 F.2d at 66, the sanction must nevertheless withstand an additional test. In 1977, the penalty provision of the Act, 7 U.S.C. § 2021, was amended to provide that

---

5. 7 U.S.C. § 2021 provides in part:

   Any approved retail food store .... may be disqualified for a specified period of time from further participation in the food stamp program, or subjected to a civil money penalty of up to $5,000 for each violation if the Secretary determines that its disqualification would cause hardship to food stamp house-

   holds, on a finding, made as specified in the regulations, that such store .... has violated any of the provisions of this chapter or the regulations issued pursuant to this chapter.... The action of disqualification or the imposition of a civil money penalty shall be subject to review as provided in section 2023 of this title.

if disqualification would cause hardship to food stamp households, a civil money penalty may be levied in place and stead of suspension. A careful reading of the legislative history undergirding this amendment makes manifest the proposition that civil penalties are preferred to disqualification when such hardship would likely result. Addressing the provision for penalties in the 1977 Act, the House Committee stated:

> To deal with retailer abuse, the Committee bill calls for the addition of civil penalties of up to $5,000 as an alternative punishment to outright program disqualification or suspension, and, indeed, one that should normaly [sic] be imposed instead of disqualification (section 12). This would benefit all three major participants in the program—consumers, businesses and the Department itself. Consumers would not lose the convenience of nearby stores during a period of suspension. Businesses would not face the prospect of losing up to half of their business volume during a suspension period.... And the Department would not face the difficult choice between a very lenient punishment (a reprimand) and a very severe one (suspension) in those cases where something between those two is far more appropriate.

H.R.Rep. No. 95–345 at 397, *reprinted in* (1977) U.S.Code Cong. & Ad.News 1704, 1941, 2326. It is important to note that the levying of a money penalty, rather than disqualification, is not tied to any particular level of violation, but applies to any infraction no matter how egregious (provided that the violator sells a substantial variety of food items).[6] 7 C.F.R. § 278.6(g).

■ In deciding to impose the sanction of disqualification rather than a civil money penalty, the FNS had before it a petition signed by 400 residents, indicating that they would suffer if plaintiff could no longer accept food stamps. But the facts before the FNS also indicated that nine other grocery stores were located in the area, all of which accepted food stamps. Thus, the FNS could rationally conclude at the administrative level that, despite the petition, adverse effects to food stamp households would be minimal if the Market were disqualified.

The evidence introduced by the plaintiff in the de novo proceeding before this Court casts a far different light on the hardship question. According to the Survey, there are only two other stores[7] in the neighborhood which are of comparable size to the Market and which would allow residents to engage in one-stop grocery shopping. The ability to do most of a family's marketing in one place has great significance to the elderly, the infirm or those without access to transportation. A relatively few city blocks can be a long distance indeed in a less-than-tranquil urban environment when carrying heavy shopping bags or entrusted with the care of small children. Finally, the Survey shows that many neighborhood residents thought the food, especially meat, was cheaper at the Market than at other grocery stores. When one is dependent on food stamps to fulfill a family's nutritional needs, the prospect of effecting savings—even when measured in pennies per purchase—can have substantial meaning.

■ Based on the evidence introduced in this Court, combined with that before the FNS, the Court concludes that the imposition on the plaintiff of a one year disqualification from the program would work a substantial hardship on food stamp recipients living in the Broad Street neighborhood. Because of this untoward impact, it is the judgment of this Court that disqualification does not "follow rationally from the facts," *see Collazo v. United States,* 668 F.2d at 66, nor is it reasonably "aim[ed] toward fulfillment of the Act's purposes." *Id.* It is, when viewed in the illumination of the judicial and administrative record as a whole, factually unjustifiable and legally improvident. There is no reason here why a substantial money penalty will not suffice adequately as a condign punishment for the plaintiff while at the same time fulfilling

---

**6.** There is no question that plaintiff is primarily a food store and sells a substantial variety of food items.

**7.** For purposes of this analysis, the Court intentionally limits the parameters to those markets which accept food stamps.

the salutary purposes of the Act and impressing the general public with the gravity of the infraction.

The Court's holding on the disqualification sanction is motivated solely by the evidence adduced as to the plight of the food stamp households in the neighborhood. The Court has scant sympathy for merchants who profit from government programs but cavalierly disregard the rules, whether by carelessness or by design.[8] Such conduct merits both universal censure and due punishment. With the welfare of the neighborhood itself at risk, however, the imposition of a long-term suspension on the Market would succeed in jettisoning the baby with the bath water—a circumstance which cannot, under the law, be countenanced.

### IV.

In line with the findings and conclusions expressed herein, it is hereby ORDERED:

1. That the November 13, 1981 determination of the Food and Nutrition Service as to the occurrence of violations of the Act on the part of Broad Street Food Market, Inc. is supported by substantial evidence in the record as a whole, and is AFFIRMED.

2. That the determination made by the Food and Nutrition Service imposing on the said Broad Street Food Market, Inc. a sanction of disqualification from program participation for a period of one year is not supported by substantial evidence in the record as a whole, and is VACATED.

3. That a civil money penalty be imposed on the plaintiff as a sanction for the aforesaid violation(s).

4. That the matter may be, and the same hereby is, REMANDED to the Food and Nutrition Service for purposes of establishing and fixing, in accordance with the provisions of 7 C.F.R. § 278.6(h) and (i), the amount of the monetary sanction to be as-

sessed against Broad Street Food Market, Inc., and to fix the time for payment thereof.[9]

5. That the Broad Street Food Market, Inc. be, and hereby is, permanently enjoined from further violations of the Food Stamp Act, 7 U.S.C. §§ 2011 *et seq.,* and the regulations promulgated thereunder.

6. That the Temporary Restraining Order entered in this matter by Order of this Court dated December 15, 1981, be, and hereby is VACATED as moot.

---

**8.** In fairness, there is no evidence in this record of a scheme to defraud the government; the agency's choice of sanction, given the guidelines of the regulations, indicates that the FNS is satisfied in this respect. 7 C.F.R. § 278.-6(e)(1).

**9.** Because the "arbitrary and capricious" standard of review of the sanctions imposed on

violations is premised on agency expertise and the interest in uniformity of sanctions, *see Kulkin v. Bergland,* 626 F.2d at 184–85; *Cross v. United States,* 512 F.2d at 1218, the FNS should determine the precise penalty in the first instance. *See Goodman v. United States,* 518 F.2d at 512.