DEPARTMENT OF CIVIL RIGHTS *ex rel* JOHNSON v
SILVER DOLLAR CAFE

Docket No. 91348. Argued April 7, 1992 (Calendar No. 3). Decided
September 29, 1992.

Mary H. Johnson filed a complaint with the Civil Rights Commis-
sion against her employers, Paul and Margaret Anson, doing
business as the Silver Dollar Cafe, alleging sexual harassment
by Paul Anson. The commission adopted a hearing referee's
finding of harassment, awarding Ms. Johnson $2,660 in back
wages and $30,000 in compensatory damages. The Hillsdale
Circuit Court, Harvey W. Moes, J., affirmed, but reduced com-
pensatory damages to $4,515. The Court of Appeals, SAWYER,
P.J., and HOOD, J. (MURPHY, J., concurring), reversed and
remanded for reinstatement of the award of compensatory
damages (Docket No. 125790). The defendants appeal.

In an opinion by Justice LEVIN, joined by Chief Justice
CAVANAGH, and Justices BRICKLEY and GRIFFIN, the Supreme
Court *held:*

A circuit court, in reviewing a decision of the Civil Rights
Commission, may substitute its judgment for that of the com-
mission. The Court of Appeals must review the judgment of the
circuit court under the clearly erroneous standard, substituting
its judgment for that of the circuit court only where, after
review of the whole record, it is left with the definite and firm
conviction that a mistake has been committed. Remand to the
Court of Appeals is required for reconsideration of its decision
under the clearly erroneous standard.

Justice BOYLE, joined by Justice MALLETT, concurring in part
and dissenting in part, stated that both the Civil Rights Act
and the constitution provide for de novo review of Civil Rights
Commission decisions by the circuit court. While the court may
substitute its judgment for the findings, conclusions, and deci-
sion of the commission, its review is not one of unfettered
substitution of judgment. The reviewing court must recognize
the superior position of the initial factfinder in resolving issues
of credibility. In this case, the circuit court did not review the
matter de novo. Rather, it applied the substantial evidence test
to the record and made no independent findings of fact, requir-

ing remand to the circuit court for review de novo of the findings and conclusions of the commission.

The circuit court also applied an incorrect legal standard when it reduced the compensatory damages award, comparing damages for the mental anguish caused by sexual harassment to damages for wrongful death and injury resulting from automobile accidents.

Justice Riley, concurring in part and dissenting in part, stated that review by the circuit court of decisions of the Civil Rights Commission is limited to determining whether the commission's findings of fact and legal conclusions are supported by competent, material, and substantial evidence on the whole record. In this case, the circuit judge, in applying the substantial evidence test to the record and the evidence presented, concluded that the evidence did not support the decision to award $30,000 in compensatory damages and did not substitute his judgment for that of the Civil Rights Commission.

Reversed and remanded.

188 Mich App 147; 469 NW2d 42 (1991) reversed.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Michael R. Smith,* Prosecuting Attorney, and *Robert L. Willis, Jr., Susan I. Leffler,* and *Mary Louise Pridmore,* Assistant Attorneys General, for the plaintiff.

*Kurt Berggren* for the defendant.

Levin, J. The circuit judge, on appeal from the Civil Rights Commission, reduced an award for sexual harassment to Mary Helen Johnson against her employers, Paul and Margaret Anson, doing business as Silver Dollar Cafe. The Court of Appeals reinstated the award.[1]

We reverse and remand to the Court of Appeals to consider whether the circuit judge clearly erred in awarding $4,515 compensatory damages for humiliation, extreme embarrassment, emotional distress, indignities to Johnson and her character, and great mental anguish.

[1] 188 Mich App 147; 469 NW2d 42 (1991).

I

Johnson worked for the Silver Dollar Cafe for approximately fifteen months during 1983 and 1984. The owners, Paul Anson and his wife, Margaret Anson, both worked in the restaurant. Almost immediately after Johnson was hired, Paul Anson made explicit sexual remarks, including that he would like to suck Johnson's breasts and engage in cunnilingus. He offered her money to go to bed with him. When she bent over to pick up a pad on the floor, he grabbed her buttocks.

Johnson complained to Margaret Anson, who sometimes observed this behavior. Margaret Anson would apologize and promise that she would speak to Paul Anson and see that such conduct ceased, and asked Johnson not to quit. But the harassment continued until, eventually, Johnson was discharged. The stated basis was that she had failed to report all the tips she had received.

Johnson claimed that she experienced nightmares, crying spells, and great emotional pain and distress. The Civil Rights Commission awarded Johnson $2,660 in back wages and $30,000 for humiliation, extreme embarrassment, emotional distress, indignities to her person and character, and great mental anguish.

The circuit judge affirmed the award of $2,660 in back wages, but reduced the compensatory award from $30,000 to $4,515, approximately twice the wages. The Court of Appeals reinstated the compensatory award of $30,000.

II

The Ansons do not challenge the finding of sexual harassment or the award of $2,660 in back pay. They contend that the Court of Appeals erred

in stating that "the circuit court is permitted to substitute its findings of fact only when it has determined that the referee's findings were not supported by competent, material, and substantial evidence" and may not "substitute its own findings of fact merely because it disagrees with those reached by the referee."[2]

In *Walker v Wolverine Fabricating & Mfg Co, Inc,* 425 Mich 586; 391 NW2d 296 (1986), this Court held that a person who is aggrieved by a decision of the Civil Rights Commission may not introduce evidence on review by the circuit court, and that review by the circuit court is on the record made before the commission.

The Civil Rights Commission contends that *Walker* also ruled that the review de novo contemplated by the constitution[3] and the statute[4] is limited to a determination whether there is competent, material, and substantial evidence to support the decision of the Civil Rights Commission, and, accordingly, the circuit court may not make its own findings of fact unless there is an absence of competent, material, and substantial evidence.

The Ansons did not seek to introduce additional evidence in circuit court, and thus there is no need to reconsider whether the decision in *Walker,* barring the introduction of additional evidence in the circuit court, should be reconsidered.[5] We thus

[2] *Id.,* p 154.

[3] Const 1963, art 5, § 29; see part III for text.

[4] "An appeal before the circuit court shall be reviewed de novo." MCL 37.2606(1); MSA 3.548(606)(1).

[5] In *Walker,* the complainant appealed from a decision of the Civil Rights Commission dismissing his complaint after finding that there were insufficient grounds to issue a charge. The meritorious issue on appeal was thus whether there was sufficient evidence to support a charge.

In the instant case, a charge was filed, and thus the issue would be somewhat different, namely, whether there was sufficient evidence to support the decision of the commission finding for or against the complainant.

do not readdress the question actually presented and decided in *Walker.* As set forth in *Walker,* additional evidence may not be introduced in the circuit court on review of a decision of the Civil Rights Commission. Review by the circuit court shall continue to be on the record made before the commission.

III

Although not necessary to decision, this Court in *Walker* opined regarding the scope of circuit court appellate review, stating:

> [T]he circuit court shall review the record produced at the CRC *anew, drawing its own inferences and conclusions* from that record. The court shall determine whether the CRC's factual findings and legal conclusions *are supported by competent, material, and substantial evidence on the whole record,* and whether it acted arbitrarily or without authority.[6] [Emphasis added.]

The Court of Appeals acknowledged that the foregoing statement is "confusing and contradictory,"[7] stating:

> The first sentence states that the review is de novo; however, the second describes the more limited review to determine if the findings are supported by "competent, material, and substantial" evidence. This language is usually associated with the standard of review provided in Const 1963, art 6, § 28 and § 106 of the Administrative Procedures Act [MCL 24.306(d); MSA 3.560(206)(d)].[8]

In an apparent effort to harmonize the "confusing

[6] *Id.,* p 617.

[7] *Silver Dollar, supra,* p 153.

[8] *Id.*

and contradictory" language of *Walker,* the Court of Appeals said: "While the review of CRC orders is labeled 'de novo,' we conclude that the scope of review is qualified by the inclusion of this limiting language"[9]—"competent, material, and substantial evidence" language.

### IV

The Civil Rights Commission was established pursuant to Const 1963, art 5, § 29, which provides in part:

Appeals from final orders of the commission, including cease and desist orders and refusals to issue complaints, shall be tried de novo before the circuit court having jurisdiction provided by law.

The constitution also provides for judicial review of agency decisions, and that such review shall include "as a minimum" a determination whether an agency decision, in which a hearing is required, is supported by "competent, material and substantial evidence on the whole record."[10]

The Civil Rights Commission would read out of the clause "tried de novo" the words "de novo" as well as the word "tried."

The term "de novo" has been defined as "anew; afresh; again; a second time; once more; in the same manner, or with the same effect."[11] It has been said:

---

[9] *Id.*

[10] This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. [Const 1963, art 6, § 28.]

[11] 25A CJS, p 483.

The very concept, "de novo" hearing, means that all matters therein in issue are to be considered "anew; afresh; over again,". . . . [*People v Bourdon,* 10 Cal App 3d 878, 881; 89 Cal Rptr 415 (1970).][12]

To give meaning to the term "de novo," we must hold that a circuit court, in reviewing a decision of the Civil Rights Commission, may substitute its assessment for the findings, conclusion, and decision of the Civil Rights Commission.

v

Because it is clear that the circuit judge substituted his judgment for the judgment of the Civil Rights Commission, there is no need to remand to the circuit court for further consideration.

It is, however, necessary to remand to the Court of Appeals to reconsider its decision. We agree with the Civil Rights Commission that the governing standard on review by the Court of Appeals of a decision of the circuit court, following review by that court of a decision of the Civil Rights Commission, is set forth in *Dixon v Ford Motor Co,* 402 Mich 315, 318-319; 262 NW2d 666 (1978).

In *Dixon,* the Civil Rights Commission determined that the plaintiff had been discharged be-

---

12 Similarly, see *Doe v United States,* 261 US App DC 206; 821 F2d 694 (1987); *Broad Street Food Market, Inc v United States,* 555 F Supp 1319 (D RI, 1983); *Farmingdale Supermarket, Inc v United States,* 336 F Supp 534 (D NJ, 1970); *Hohenberg Bros Co v Missouri Pacific R Co,* 586 SW2d 117 (Tenn App, 1979); *Southern Canal Co v State Bd of Water Engineers,* 159 Tex 227; 318 SW2d 619 (1958); *Webster City v Draheim,* 292 NW2d 406 (Iowa, 1980); *Dep't of Motor Vehicles v Andersen,* 84 Wash 2d 334; 525 P2d 739 (1974); *Wright v Employment Div,* 24 Or App 323; 545 P2d 613 (1976); *In re Reassignment of Hayes,* 261 NC 616; 135 SE2d 645 (1964); *Rudolph v Alabama,* 286 Ala 189; 238 So 2d 542 (1970); *In re Poole,* 136 Vt 242; 388 A2d 422 (1978); *Pinkett v Maryland,* 30 Md App 458; 352 A2d 358 (1976); *Young v Dep't of Environmental Resources,* 144 Pa Commw 16; 600 A2d 667 (1991).

cause of race. The circuit court affirmed. The Court of Appeals reversed on the ground that the circuit court's decision was not "supported by competent, material and substantial evidence." This Court reversed and reinstated the judgment of the circuit court. This Court said that the Court of Appeals reviews a decision of the circuit court under the clearly erroneous standard, and that the Court of Appeals shall "substitute its own appraisal of the record where, on review of the 'whole record,' it is 'left with the definite and firm conviction that a mistake has been committed.' *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976)."[13] See *Beason v Beason,* 435 Mich 791, 802; 460 NW2d 207 (1990).

We reverse and remand to the Court of Appeals to consider whether the circuit judge clearly erred in awarding $4,515 compensatory damages for humiliation, extreme embarrassment, emotional

---

[13] The quoted passage appears in the second of the following two paragraphs of the opinion of the Court:

An appeal to the circuit court from a final order of the commission is a trial *de novo.* The Court of Appeals was of the opinion that although it was reviewing the case on appeal from the circuit court since Const 1963, art 6, § 28 and MCLA 24.306; MSA 3.560(206) require a determination whether the judgment of the circuit court was "supported by competent, material and substantial evidence on the whole record," its review was not governed by the "clearly erroneous" standard contained in GCR 1963, 517.1.

The constitutional standard for judicial review of agency action—competent, material and substantial evidence on the whole record—is not a higher standard than the "clearly erroneous" standard of rule 517.1. Rule 517.1 requires that the reviewing court substitute its own appraisal of the record where, on review of the "whole record," it is "left with the definite and firm conviction that a mistake has been committed." *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976). If the reviewing court, the Court of Appeals, concludes on its examination of the record that the judgment on appeal is not supported by "competent, material and substantial evidence on the whole record," then it should have a "definite and firm conviction that a mistake has been committed." [*Dixon, supra,* pp 317-318.]

distress, indignities to Johnson and her character, and great mental anguish.

CAVANAGH, C.J., and BRICKLEY and GRIFFIN, JJ., concurred with LEVIN, J.

BOYLE, J. (*concurring in part and dissenting in part*). I agree with Justice LEVIN that the scope of review to be used by the circuit court in reviewing the decision of the Civil Rights Commission is review de novo as expressly provided both in the constitution[1] and in the statute.[2] I write separately to state that I cannot agree that, in this instance, the circuit court reviewed the Civil Rights Commission decision de novo. In that respect I agree with Justice RILEY.

I

The full factual background is uniquely relevant to the claims of emotional distress, mental anguish, and humiliation. Mary Johnson began[3] working as a waitress for the owners of the Silver Dollar Cafe, defendants Paul and Margaret Anson, in July 1983. Almost from the beginning, Ms. Johnson became the object of crude, explicit sexual remarks made by Mr. Anson.[4] On one occasion,

---

[1] Const 1963, art 5, § 29.

[2] MCL 37.2606; MSA 3.548(606).

[3] The Ansons had once before asked Ms. Johnson to work for them in their restaurant. Because she had previously been the object of Mr. Anson's sexual advances, she declined their offer. The Ansons were "anxious for [Ms. Johnson] to work for them because she was a jolly person, had a good personality, smiled all the time, got along with people and was honest."

[4] Although the conduct that Ms. Johnson was subjected to is vulgar, I find it necessary to set out the findings of the Civil Rights Commission in that regard. The Civil Rights Commission found:

15. Respondent Paul Anson told Claimant he would like to suck her breasts until her nipples stuck out.

Mr. Anson "grabbed [Ms. Johnson's] buttocks when she bend [sic] over to pick up her bill pad." Ms. Johnson became upset and, in response, grabbed "a knife out of the drawer and threatened to use it if Paul Anson touched her again."

Mr. Anson's conduct "often reduced [Ms.] Johnson to tears."[5] She would become visibly upset and extremely nervous when Mr. Anson was present.[6] Mr. Anson would on occasion wait in the cafe's parking lot at closing time, and because of this, Ms. Johnson often asked patrons to stay with her until she closed the cafe.[7]

16. Respondent Paul Anson told Claimant he couldn't understand why she had such big breasts and skinny legs.

17. Respondent Paul Anson told the Claimant: "You have a love button. I would love to eat that."

18. Respondent Paul Anson told the Claimant he would like to "eat" her until she came all over his face.

19. Respondent Paul Anson told Claimant that her husband, a Vietnam veteran who had been wounded five times and had been in a serious truck accident, was not a man and that if the Respondent "had" her, she would leave her husband.

20. Respondent Paul Anson told Claimant she did not have to do her job; she could do "another" job if she did him sexual favors.

21. Respondent Paul Anson asked the Claimant to go to bed with him.

22. On different occasions, Respondent Paul Anson offered Claimant one hundred dollars for ten minutes of her time for sexual favors.

23. Respondent Paul Anson would throw Claimant's bill pad on the floor and, when she bent to pick it up, tell her how "good looking" her "ass" was.

24. Respondent Paul Anson would stare at the Claimant as though he was undressing her.

25. Respondent Paul Anson would make motions with his mouth to the Claimant such as licking his lips and puckering up.

26. Respondent Paul Anson would approach the Claimant in a narrow aisle where she washed dishes and rub the front of his body against her.

[5] 188 Mich App 147, 151; 469 NW2d 42 (1991).

[6] *Id.*

[7] *Id.*

Mr. Anson made many of these remarks and performed many of these acts in his wife's presence. While Mrs. Anson had assured Ms. Johnson that she would talk to her husband and promised that his conduct would stop, it did not. In fact, Mrs. Anson eventually told Ms. Johnson that "she had to wait on Paul Anson and be cordial toward him." However, when Ms. Johnson threatened to quit, Mrs. Anson "begged" her "not to quit because she was needed." In October 1984, Ms. Johnson was fired ostensibly for underreporting her tips. The Civil Rights Commission found this to be pretextual.

## II

"No area of administrative law has been subjected to more attention yielding less clarity than the scope of review of administrative action."[8] Scope of review refers to "how much a court will undertake to substitute its judgment for that of an agency which has made a decision."[9] To determine "how much" of its judgment a court may substitute for that of an agency, this Court must look to the underlying statute that created the agency.[10]

The Civil Rights Commission was created by Michigan voters when they approved the revised constitution in April 1963.[11] Article 5, § 29 pro-

[8] LeDuc, Michigan Administrative Law, § 9:01, p 3).

[9] Id., p 2

[10] It is not only the statute that created the agency that defines the scope of review, but also the constitution and related statutes that may define its scope. LeDuc, n 8 supra, p 3. In fact, in a report to the Michigan Legislature, the Michigan Law Revision Commission identified nearly two hundred statutes dealing with judicial review of administrative decisions. See Michigan Law Revision Commission, 25th Annual Report 1990, p 21 and attachments 1-5, pp 47-140.

[11] Cramton, The powers of the Michigan Civil Rights Commission, 63 Mich L R 5 (1964).

vides: "There is hereby established a civil rights commission . . . ." The constitution also specifies "how much" review decisions of the commission will receive from circuit courts: "Appeals from final orders of the commission . . . shall be tried de novo before the circuit court having jurisdiction provided by law."[12] Review of Civil Rights Commission decisions is also provided by statute. Under § 606 of the Civil Rights Act, "An appeal before the circuit court shall be reviewed de novo."[13] Thus, both the statute and the constitution provide for de novo review of Civil Rights Commission decisions.

This Court, in *Walker v Wolverine Fabricating & Mfg Co, Inc,* 425 Mich 586; 391 NW2d 296 (1986), interpreted the phrase "[a]ppeals . . . tried de novo" in the constitution to require a review of the record before the Civil Rights Commission. Litigants were not entitled to an entirely new evidentiary hearing on appeal in the circuit court. We held that

> the underlying intent of the framers would best be effected by requiring circuit courts to review final decisions of the CRC de novo by taking a fresh look at the evidence and testimony in the record produced before the agency, and by determining whether the CRC's factual findings and legal conclusions are supported by competent, material, and substantial evidence. [*Id.* at 590.]

The parties in the instant case do not address

[12] Another section of the Michigan Constitution "provides for extensive judicial review of decisions of 'any administrative officer or agency existing under the constitution or by law.'" Cramton, n 11 *supra* at 20, quoting Const 1963, art 6, § 28. Professor Cramton, however, notes that "this provision is largely displaced insofar as the Civil Rights Commission is concerned by the *more specific judicial review provisions* of the third paragraph of article V, section 29 . . . ." *Id.* (Emphasis added.)

[13] MCL 37.2606(1); MSA 3.548(606)(1).

the tension that exists between the statutory "review de novo" and the constitutional "tried de novo." The portion of our holding in *Walker* that requires the court to review only the agency record without taking new evidence is therefore not called into question.

I am persuaded, however, that, despite my agreement with the *Walker* majority, our statement that the court must determine whether the CRC's factual findings are supported by competent, material, and substantial evidence was not necessary to our decision,[14] and thus was obiter dictum.[15] The exact scope of review, or just "how much" of the reviewing court's judgment could be substituted for that of the agency, was not at issue in *Walker.* It is, however, the question that we must answer today.

"In the context of appellate review, the term [de novo] suggests a new look at a case, starting from scratch, without deference to what has gone before. . . . As one might expect, the de novo standard of review has never applied this literally."[16] In *Beason v Beason,* 435 Mich 791, 799-800;

[14] As Professor LeDuc points out, "The holding also exceeds the issue presented, since the challenged action was not one based on a hearing and is therefor one to which the substantial evidence test has no application." LeDuc, n 8 *supra,* § 9:43, p 56. Professor LeDuc is correct. Article VI, § 28 of the constitution expressly states that the "competent, material and substantial evidence on the whole record" standard applies "in cases in which a hearing is required[.]" Other agency actions—final decisions, findings, rulings, and orders— are reviewed to determine whether they were authorized by law.

[15] Professor LeDuc also criticizes the *Walker* decision as failing "to recognize the basic difference between . . . de novo judicial review and the more limited nature of the substantial evidence scope of judicial review . . . ." LeDuc, n 8 *supra,* § 9:43, p 56. Moreover, "the entire opinion is devoid of any basis whatsoever for determining that the use of the words de novo meant the same as the provision for substantial evidence in Article VI, Section 28." *Id.,* p 56. Professor LeDuc continues: "The *Walker* decision is the Constitution as the majority would have written it, not the one which was written." *Id.,* p 56.

[16] Powell & McAlpine, *Standards of review in Michigan,* 70 Mich B J 28, 29-30 (1991).

460 NW2d 207 (1990), we noted that "[v]ery early, this Court recognized the superior position of the trial court in making factual determinations and, consequently, limited review of such determinations . . . ."[17]

Powell & McAlpine recognize several formulations of the de novo standard. For instance:

1. "In equity cases, this Court's review of the record is de novo with due deference being given to the findings of the trial court. This Court will sustain those findings unless its ruling would have been contrary to that of the trial court." [*Marconeri v Village of Mancelona,* 124 Mich App 286, 287-288; 335 NW2d 21 (1983).]

2. "A suit to quiet title is equitable in nature and subject to de novo review. However, this Court will give great weight to the findings of fact made by the trial court and will not disturb those findings unless convinced that it would have reached a different result had it been in the position of the lower court." [*Connelly v Buckingham,* 136 Mich App 462, 467; 357 NW2d 70 (1984).]

3. "Preliminarily, we note that our review of an equitable accounting is de novo, although the lower court's findings will not be disturbed unless the evidence clearly preponderates in the other direction." [*Nogueras v Maisel & Associates of Michigan,* 142 Mich App 71, 81; 369 NW2d 492 (1985).]

4. "We review the findings of a court of equity de novo. We will sustain the findings unless convinced that had we heard the evidence in the first instance we would have been compelled to reach a contrary result." [*Orion Charter Twp v Burnac Corp,* 171 Mich App 450, 459; 431 NW2d 225 (1988).]

We also recognized this anomaly in *Beason v Beason,* 435 Mich 791, 800; 460 NW2d 207 (1990).

It has been variously stated that the appellate court "generally does not reverse or modify unless convinced that it would have had to reach another result had it occupied the position of the trial court," or "unless convinced that we would have reached a different conclusion had we occupied the situation of the trial court," "that we should have reached a different conclusion had we occupied the position of the trial court," or "unless it is clear the reviewing court could have reached a different result had it occupied the position of the trial judge." [Citations omitted.]

[17] We also noted:

Indeed, in *Kar v Hogan,* 399 Mich 529, 553, n 8; 251 NW2d 77 (1976), Justice Levin wrote, in dissent:

> Formerly in chancery cases, although it was commonly said that the issues of fact were tried de novo on appeal or that the Supreme Court must weigh the evidence and reach an independent conclusion on review of the facts, this did not mean that the findings of the trial judge were entitled to no consideration. Notwithstanding the right and duty of the Supreme Court to make its independent evaluation of the evidence, it would not set aside the findings of the trial judge unless it was convinced that a clear showing of error had been made. Running through the opinions are phrases such as "clear error," "manifest error," "palpably erroneous.". . . Especially when there was a sharp conflict in the evidence, the reviewing court would not disturb the trial court's determination of fact questions, unless it was clear that a wrong conclusion had been reached. The Supreme Court *was most reluctant* to disturb the findings of a trial judge based on credibility, since the trial judge, as the trier of facts, had the advantage of observing the witnesses. [Quoting 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), Authors' Comments accompanying Rule 517, p 596.]

More recently, in *Sparks v Sparks,* 440 Mich

---

"There is much to believe and much to disbelieve, and the case is one of those where the decision of the judge exercising primary jurisdiction on matters of fact ought not to be overruled by a court of appeal except upon clear and satisfactory grounds. The appellate tribunal ought to be fully persuaded that it *must* have reached a different conclusion had it occupied the position of the court appealed from and been favored with all the advantages of that court for judging rightly." [*Beason, supra* at 800, quoting *Nicholas v Nicholas,* 50 Mich 162; 15 NW 64 (1883).]

Moreover, "It is also said that in a chancery case the decree of the trial court will not be reversed unless the record fails to sustain the decree." *Beason* at 801.

141, 147; 485 NW2d 893 (1992), we again discussed, albeit also in a different context, the meaning of de novo review. Chief Justice Cavanagh noted that because the trial court is in a better position to judge the credibility of the witnesses, the trial judge's findings of fact are entitled to considerable weight.

While there does not appear to be a consensus regarding the exact meaning of the term de novo, one thing is clear: This Court has consistently recognized the superior position of the trial court in making findings of fact. In fact, one early article discussing the newly created Civil Rights Commission recognized the superior position of the factfinder in cases brought before the Civil Rights Commission. In discussing the potential interpretation of the term "de novo" in the constitution, he noted that the reviewing court would be required to

> exercise its independent judgment as to questions of fact, as well as law, on the record complied before the Civil Rights Commission. The difficulty with this view is that findings based on the credibility of witnesses (which are very important in the resolution of discrimination cases) are made by a trier who has neither seen nor heard the witnesses.[18]

Thus, while I agree with Justice Levin that "[t]o give meaning to the term 'de novo,' we must hold that a circuit court, in reviewing a decision of the Civil Rights Commission, may substitute its assessment for the findings, conclusion, and decision of the Civil Rights Commission," *ante* at 116, I do not agree that the circuit court's review is one of unfettered substitution of judgment. The reviewing

18 Cramton, n 11 *supra* at 24.

court must recognize the superior position of the initial factfinder in resolving issues of credibility.

I also cannot agree that the circuit court reviewed this matter de novo, as Justice LEVIN and the Court of Appeals suggest. As Justice RILEY notes in her opinion, the circuit court applied the substantial evidence test to the record.[19] Indeed, the circuit court's order supports this conclusion. In it the court expressly stated that the Civil Rights Commission's findings of fact either were supported or not supported by the record. Moreover, the circuit court on review made no independent findings of fact. Thus, I would remand the case to the Court of Appeals for remand to the circuit court for review de novo of the findings and conclusions of the Civil Rights Commission, keeping in mind the superior position of the factfinder in matters of credibility.

III

The scope of the Court of Appeals review of the circuit court's decision presents "[t]he question . . . whether each succeeding reviewing court should apply the same standard of review to the agency fact-finding or should instead limit their review to the decisions of the previous court."[20]

Because the parties do not dispute that we must apply the clearly erroneous standard set forth in *Dixon v Ford Motor Co,* 402 Mich 315; 262 NW2d 666 (1978), this is not the appropriate case to reëxamine the clear error standard of appellate review.[21] Both Justice LEVIN and Justice RILEY adopt that standard, and I agree that reëxamination of the question should await another day.

[19] *Post* at 135-138.

[20] LeDuc, n 8 *supra,* § 9:49, p 68.

[21] See *id.,* § 9:48, pp 64-67.

It is worth observing, however, that concerns regarding deference to agency expertise are raised not only by the concept of de novo review of the commission by the circuit court, but also by application of the clearly erroneous standard for appellate review articulated in *Dixon.*

Professor LeDuc differentiates between the substantial evidence standard of review and the clearly erroneous standard and concludes that

> the clearly erroneous test gives a reviewing court greater flexibility and power than does the substantial evidence test. A decision could meet the substantial evidence test and be reasonable and still be overturned on review under the clearly erroneous test. . . . If the appropriate standard is the substantial evidence test, a reviewing court cannot set aside a reasonable, but mistaken finding of fact. If the appropriate standard is the clearly erroneous standard, it can.[22]

*Dixon* assumed, without expressly deciding, that the Court of Appeals would review the circuit court and not the Civil Rights Commission, the method of review of the decision of the inferior tribunal that comports with the roles of the reviewing courts in the federal system.[23] In *Universal Camera Corp v Nat'l Labor Relations Bd,* 340 US 474; 71 S Ct 456; 95 L Ed 456 (1951), the Court characterized its own role in the review of agency findings of fact as follows:

> Our power to review the correctness of application of the present standard ought seldom to be called into action. . . . This Court will intervene only in what ought to be the rare instance when

---

[22] *Id.,* pp 66-67.

[23] See *id.,* § 9:49, p 68. LeDuc suggests that "[t]he setting in Michigan is ripe for application of the clearly erroneous test as applied [by] the United States Supreme Court . . . ."

the standard appears to have been misappre-
hended or grossly misapplied. [*Id.* at 490-491.]

The effect of the Court's decision in *Universal
Camera* is that

the initial court of review operates as the primary
locus of judicial review of agency fact-finding and
bears the responsibility of applying the appropri-
ate scope of review to such fact-finding. Each
subsequent reviewing court reviews the findings of
the earlier reviewing court, rather than the find-
ings of the agency. This defines the function of the
first reviewing court as the primary fact-finding
check on agencies and represents a much better
use of judicial resources.[24]

IV

In my view, the circuit court applied an incor-
rect legal standard when it reduced the compensa-
tory damages award of the Civil Rights Commis-
sion.

The purpose of the Civil Rights Act is "to eradi-
cate discrimination and to make persons whole for
injuries suffered as a result of discrimination."[25] As
one treatise notes, "one can easily imagine that
some of the most damaging aspects of discrimina-
tion affect *the person suffering the discrimination*
rather than his or her pocketbook. . . . [M]any
victims of such discrimination describe the occur-
rence as the singularly most humiliating or enrag-

---

[24] *Id.*

[25] *Dep't of Civil Rights ex rel Cornell v Sparrow Hosp Ass'n,* 423
Mich 548, 564; 377 NW2d 755 (1985).

ing event in their life."[26] Damages for humiliation, outrage, and embarrassment are allowed under the Civil Rights Act to attempt to make persons whole for the injuries suffered.[27]

We have held when reviewing a damages award

---

[26] 1 Michigan Law of Damages (2d ed), Damages Recoverable in Civil Rights Cases, § 9.9, pp 9-7 to 9-8. (Emphasis added.)

> Some professionals believe that sexual harassment can be worse than rape for some victims, since the dynamics include repetitive reinforcement of degradation and a sense of powerlessness, sometimes on a daily basis for many years. "It's gradual," comments one professional, "if you're raped, it's an immediate and intense intrusion on your being . . . [sexual harassment] erodes away at your basic being as a woman." [Sepler, *Sexual harassment: From protective response to proactive prevention,* 11 Hamline J of Pub L & Policy 61, 67 (1990). Citation omitted.]

In addition to the emotional and psychological effect, victims of harassment suffer economic consequences. A woman may leave a job in which she was sexually harassed. "[T]his often means moving from one entry-level position to another, failing to achieve sufficient tenure at a single company for merit increases and promotions . . . ." *Id.*

Sexual harassment in the workplace affects not only the victim of the harassment but also affects the organization in which the harassment occurred.

> [T]he problem of sexual harassment costs a typical Fortune 500 company $6.7 million dollars each year in absenteeism, employee turnover, low morale and low productivity. Add to this the increasing costs of litigation and the growing number of financial awards to victims of such harassment, and sexual harassment becomes a problem of substantial economic proportions. [*Id.* at 68, citing Sandroff, *Sexual harassment in the Fortune 500,* Working Women Magazine, December 1988 at 69.]

See, generally, Final Report of the Michigan Supreme Court Task Force on Gender Issues in the Courts; Final Report of the Michigan Supreme Court Task Force on Racial/Ethnic Issues in the Courts.

[27] See *Eide v Kelsey-Hayes Co,* 431 Mich 26; 427 NW2d 488 (1988). See also *Reithmiller v Blue Cross & Blue Shield of Michigan,* 151 Mich App 188, 202; 390 NW2d 227 (1986) ("damages for mental and emotional distress are recoverable under the Civil Rights Act"); *Slayton v Michigan Host, Inc,* 122 Mich App 411, 417; 332 NW2d 498 (1983) ("These types of injuries are the kind that the Elliott-Larsen Civil Rights Act was designed to protect against, and to hold otherwise would undercut the legislative scheme to remedy discriminatory wrongs").

for pain and suffering "that there is no absolute standard by which to measure" awards for pain and suffering,[28] and that "awards for personal injury should rest within the sound judgment of the trier of fact, particularly awards for pain and suffering . . . ."[29] We have also recognized that "since no trier of fact can value pain and suffering with mathematical certainty, a reviewing court must offer 'something more tangible than a difference of opinion as to amount' before it sets aside a non-jury award as clearly erroneous."[30]

In *Precopio v Detroit,* 415 Mich 457; 330 NW2d 802 (1982), we cautioned against using past awards for analogous injuries as the guidepost for determining whether damages were excessive. Analogous cases are only one factor in this decision. Other factors include the evidence presented at the hearing on the plaintiff's suffering. However, we stated that "if research uncovers a sufficient sample of reviewed awards, comparisons with analogous cases may prove of some value."[31] Thus, if awards are analogous, and if research uncovers a sufficient sample, a reviewing court may rely on those amounts.

---

[28] *Precopio v Detroit,* 415 Mich 457, 464-465; 330 NW2d 802 (1982). But see *Howard v Canteen Corp,* 192 Mich App 427, 436; 481 NW2d 718 (1991) (Evidence to support a $200,000 award for mental anguish, humiliation, and emotional distress was "found in the harassment and discrimination inflicted upon [the plaintiff] for a lengthy period of time"); *Brunson v E & L Transport Co,* 177 Mich App 95, 106-107; 441 NW2d 48 (1989) (Evidence to support an $80,000 award for emotional distress was "found in the long history and obvious pattern of gender discrimination practiced upon plaintiff by defendant"). However, the exact length of time involved in each case is unclear.

[29] *Precopio,* n 28 supra at 464.

[30] *Id.* at 470-471. While it is true that the Court was reviewing the damages award under a clearly erroneous standard, the de novo standard of review also contemplates some deference to the trier of fact. Again the trier of fact is in the best position to view the witness' demeanor when describing the mental anguish suffered as a result of the sexual harassment.

[31] *Id.* at 471.

In the instant case, however, the circuit court compared damages for the mental anguish caused by sexual harassment to damages for wrongful death and injury resulting from automobile accidents. In my view, three inapposite cases were not a sufficient sample from which to compare awards.[32]

## CONCLUSION

I would remand the case to the Court of Appeals for remand to the circuit court for further review consistent with our decision today.

MALLETT, J., concurred with BOYLE, J.

RILEY, J. (*concurring in part and dissenting in part*). I agree with the majority that the Court of Appeals erred in its evaluation of this case. I disagree, however, with the analysis provided.

---

[32] The circuit court based its decision regarding compensatory damages in part on its experience in Hillsdale County. The court stated:

> I would remind both of them [the attorneys representing the parties] that this county is not Wayne County, it's not Ingham County, it's not even Jackson County, our neighbor to the north. We're a small rural county. When we speak of damages in this county we speak of them in much lesser terms of amount than we do in some of the more metropolitan and populace counties.

However, a recent survey of Michigan jury verdicts shows that Hillsdale county jury awards, on average, rank two percent above national jury awards, as do awards in Ingham and Jackson Counties. Wayne County ranks ten percent above the national average. Jury Verdict Research Series (Michigan ed, 1992-93), Personal Injury Verdict Survey, pp 1-2. Thus, the circuit court's stated frame of reference was incorrect as far as damages "in much lesser terms of amount" than those awarded in Ingham and Jackson Counties.

Moreover, according to the survey, the midpoint verdict, that is the "middle (median) verdict value among awards listed in ascending order," for emotional distress damages in Michigan was $113,000. *Id.* at 7-8. The verdict average for emotional distress damages was $323,313. *Id.* at 9. Both of these amounts are considerably higher than that awarded by the Civil Rights Commission.

At the heart of this dispute are two provisions governing the scope of judicial review of decisions made by the Civil Rights Commission. Const 1963, art 5, § 29 provides that "[a]ppeals from final orders of the commission . . . shall be *tried de novo* before the circuit court having jurisdiction provided by law." (Emphasis added.) The Legislature, however, has provided that "[a]n appeal [of decisions made by the Civil Rights Commission] before the circuit court shall be *reviewed de novo.*" MCL 37.2606(1); MSA 3.548(606)(1) (emphasis added). The distinction between the constitutional phrase "tried de novo" and the use of the statutory phrase "review de novo" is the source of disagreement between the litigants in this case.

In *Walker v Wolverine Fabricating & Mfg Co, Inc,* 425 Mich 586, 595; 391 NW2d 296 (1986), we considered the conflicting language and concluded that the constitutional phrase "tried de novo" is ambiguous with regard to whether it means a new trial appeal on the record or a new trial appeal based on the production of the new evidence. We determined that, given the Constitutional Convention debates and this Court's construction of the Fair Employment Practices Act in previous cases, the phrase "appeals . . . tried de novo" means an appeal on the record. *Id.* We then concluded that

one who is aggrieved by a final decision of the CRC and who seeks review in the circuit court is not entitled to an entirely new evidentiary proceeding in the circuit court. Rather, the circuit court shall review the record produced at the CRC anew, drawing its own inferences and conclusions from that record. The court shall determine whether the CRC's factual findings and legal conclusions are supported by competent, material, and substantial evidence on the whole record, and whether it acted arbitrarily or without authority. [*Id.* at 617.]

As the Court of Appeals recognized, this conclusion articulates two conflicting standards of review. 188 Mich App 147, 153; 469 NW2d 42 (1991). On the one hand, it appears to provide for review de novo, while on the other hand, it appears to provide for limited judicial review. See also *Walker, supra* at 624. The instant case presents the Court with the opportunity to clarify *Walker* and articulate the precise scope of judicial review of decisions made by the Civil Rights Commission.

I

This Court's review of decisions made by the Civil Rights Commission is uniquely different from other types of civil cases. It is well established in our common law that in the ordinary negligence case, for example, this Court will not substitute its judgment of the facts for that of the jury. *Detroit & M R Co v Van Steinburg,* 17 Mich 99, 120-121 (1868); *Dodd v Secretary of State,* 390 Mich 606, 611-612; 213 NW2d 109 (1973); *Caldwell v Fox,* 394 Mich 401, 407; 231 NW2d 46 (1975); *McCahill v Commercial Union Ins Co,* 179 Mich App 761, 767; 446 NW2d 579 (1989).[1]

Our decision in *Walker* was guided not only by the constitutional principles espoused therein, but also by the policy reasons for deferring to the judgment of the Civil Rights Commission. The lead opinion suggests that "[t]o give meaning to the term 'de novo,' we must hold that a circuit court, in reviewing a decision of the Civil Rights Commis-

---

[1] Equally established in this Court's First Amendment jurisprudence is that we will independently review the evidence and the record in libel cases, without substituting our judgment of the facts for that of the jury, to "ensure that constitutional principles are properly applied," *Rouch v Enquirer & News of Battle Creek (After Remand),* 440 Mich 238, 253; 487 NW2d 205 (1992); *Locricchio v Evening News Ass'n,* 438 Mich 84, 110-114; 476 NW2d 112 (1991), thus using a higher standard of review.

sion, may substitute [the referee's] assessment for the findings, conclusion, and decision of the Civil Rights Commission." *Ante* at 116. We expressly rejected this holding in *Walker* because we determined that the Civil Rights Commission was never intended to be merely a precursor to circuit court action. We concluded that

> [t]his interpretation furthermore meets the concerns of Constitutional Convention delegates who wanted to protect the public from an arbitrary and nonresponsible commission without making the commission an ineffective and toothless agency whose actions would be a perfunctory and largely useless prelude to the real action in the circuit court. Our analysis convinces us that trial of appeals on the record is what those who voted for a new civil rights commission really voted for, because anything else would not achieve their purposes. [*Id.* at 595-596.]

In finding that the Constitutional Convention delegates created an agency whose findings would be upheld by a circuit court providing that substantial evidence supports the Civil Rights Commission's findings, we forbade the introduction of new evidence on appeal and limited circuit court review to the record. *Id.* at 596.

As a logical extension of this rule, the substantial evidence rule limits a reviewing court to examining the findings of the commission on the record and ascertaining whether there is a sufficient factual basis on the record to support the commission's findings. As one author explained, it is not the function of the reviewing court to

> look into the record's evidentiary facts to determine for itself whether on the merits it feels that

it would make the same finding or, if not, then to remand; its own views on the merits are not competent; its only task is to ascertain the substantiality of the agency's findings as disclosed by the record. [Forkosch, *Judicial de novo review of administrative quasi-judicial fact determinations,* 25 Hastings L J 963, 964 (1974).]

In light of the analysis provided in *Walker* and the policy concerns that guided the Court's decision, I believe that circuit court review of decisions made by the Civil Rights Commission is limited to determining whether the commission's findings of fact and legal conclusions are supported by competent, material, and substantial evidence on the whole record.

II

The lead opinion suggests that "it is clear that the circuit judge substituted his judgment for the judgment of the Civil Rights Commission . . . ." *Ante* at 116. This observation is not supported by the record. The record reflects that the circuit judge consciously,[2] deliberately,[3] and methodically[4]

---

[2]   I have no argument with the finding of the board—or Bureau, that there has been a violation of civil rights. It would be ridiculous for me to state that I disagreed with them. The law again is very clear that once a finding is made, they—being the people who judge credibility cases—would be few and far between where a court interjected their opinion. I also have no problem with taking and accepting as true that which was claimed by the claimant herein, so far as the actions and the statements of Mr. Anson.

[3]   Here I agree with the findings, the actions of Mr. Anson did exceed propriety and I have no quarrel with that.

[4]   But, again, I accede to the findings of the administrative law judge, such as they are.

reviewed the entire record[5] and the corresponding case law[6] before reaching his decision regarding whether the evidence supported the decision to award $30,000 in compensatory damages.[7]

Indeed, it was the trial judge who thoroughly reviewed each and every page of the referee's record and the evidence produced to ascertain if the record substantiated the referee's award of $30,000 in compensatory damages, and if in fact the damages award was indeed compensatory, rather than punitive. One need only examine the trial court's review of the record in this action to reach this conclusion.[8]

---

[5] I have read through this voluminous 575 plus pages of transcript and find that about a good share of it never should have been testified to, had no bearing whatsoever. . . . I also find that the briefs as filed either exaggerate or denigrate the facts that took place.

[6] There's no argument in this particular case that the judge in that—administrative judge and myself cannot award punitive damages. The case cited by counsel, *Eide v Kelsey-Hayes,* 431 Mich 26 [427 NW2d 488 (1988)] sets that one out with no reservations. So we're dealing strictly with compensatory damage.

[7] No consideration was given, however, to the availability of equal or like employment or labor market or anything else in the Litchfield area. Possibly the claim was within the evidence, and I don't disturb it.

[8] I noticed on one occasion, . . . where she can't sleep nights. I think this is in one of the briefs. The part I found in her testimony, at least, was that on one night she stayed up all night talking with her husband, much less than I can't sleep nights. This was one where they were discussing some action that had taken place by Anson. Claims that she had a complete change in personalities and so forth. And yet when I read the transcript she apparently was a very happy waitress, known to everybody as "Smiles." Only when Mr. Anson came around she was not known as "Smiles." I don't believe that Mr.—or Mrs. Johnson was a Dr. Jekell [sic] and Mr. Hyde. She apparently did have some concerns when Mr. Anson was present. Difficult for me to understand, however, that she can be known as "Smiles" to the trade for 19 hours a week; for the hour that

Anson is there, for whatever time period, has a complete change in personality.

Again, I concede to the findings of the administrative law judge. Don't necessarily agree with them all, but I concede to them.

It appears that each and every problem that was testified to by Mrs. Johnson is attributable to the acts of Mr. Anson. Yet, as Mr. Susskind indicated, there has been no follow-up so far as her problems are concerned. The doctor who she saw, Dr. Jones, Patsy Jones, a chiropractor, apparently assisted her with some tightness in her back, on a half a dozen or so occasions. She wasn't sure how often. Such ended the medical treatment. No report was made to the Department of Civil Rights until after the employment terminated. And then, as I recall her testimony, she stated the story to four or five or six women at the state building, along with the person who reduced her complaint to writing. And that complaint leaves a lot to be desired when it comes to hearsay, much of which wasn't substantiated, by the way, insofar as the record is concerned. One statement I recall in that complaint as filed said that many people left the employment of the restaurant because of Anson's antics. Such was not substantiated from my reading of the record.

Claimant in this case, Miss Johnson, had many problems, she indicated. I was somewhat surprised that neither counsel picked up on one portion of the transcript as to the reason for those problems. I like to quote transcripts that haven't been quoted in briefs. *That way I can convince the attorneys and the appellate courts that I did read them.*

On the hearing of December 8, 1987, page 99—I don't know who at the time is examining her. I'm looking at the index and it would appear that this is cross examination by Mr. Susskind. I'm going to read a portion of this simply to state what I'm talking about. Showing line 8:

"[*Q.*] You have not had any reason to treat with a doctor, am I getting that right?

"*A.* I go for a mammogram.

"*Q.* Periodic checkups?

"[*A.*] Yes.

"*Q.* Just regular checkup type things?

"*A.* Uh-huh.

"*Q.* Okay. And that would include psychologists, psychiatrists, any medical doctor, including chiropractors and whatever, true?

"*A.* I've never went to a psychiatrist or any of that.

"*Q.* You had mentioned going to Patsy Jones, who is a chiropractor, while you were working there. Did you have just a back sprain or"—

And here I underline, underscore and put in quotes, along with parentheses, if I can do it.

Thus, in applying the substantial evidence test to the record and the evidence presented, the circuit court judge concluded that the evidence did not support the decision to award $30,000 in compensatory damages. Contrary to the majority's observation, he did not substitute his judgment for that of the Civil Rights Commission.

III

As the majority recognizes, we held in *Dixon v Ford Motor Co,* 402 Mich 315, 318; 262 NW2d 666 (1978), that

[t]he constitutional standard for judicial review of agency action—competent, material and substantial evidence on the whole record—is not a higher standard than the "clearly erroneous" standard of

---

"*A.* No. I was under a lot of stress from the incidents of the verbal abuse. Plus I had—my husband had an accident and just everyday stress. And I had a few deaths in my family. And I would go because my neck—I would be real stiff and Patsy was the one to pull me out of their restaurant and take me down and help me.

"*Q.* Give you an adjustment?

"*A.* Yes."

In reading the testimony I find that Mr. Johnson suffered apparently some severe war wounds, and that subsequent to that, in 1977, if I have my memory correct, was involved in a truck accident and became seriously injured. And according to all the hearsay that came into the hearing, Mrs. Johnson had been advised by Mr. Johnson's doctors that his life expectancy was not great after he attained the age of 45.

Then she also states on page 99, as I just read, everyday stress, she had some deaths in the family, and she said she was under a lot of stress from the incidents of verbal abuse.

*In other words, there's no one basis for the problems, whatever they may be, of Mrs. Johnson, and she so admitted.* It would appear from the transcript or from the findings of the referee or administrative judge, whatever they're termed, that all the troubles of the world and especially of Mrs. Johnson were laid at the feet of Mr. Anson due to his actions. I mention this only in passing, for the purpose of getting to where we're headed here, namely compensatory damages. [Emphasis added.]

rule 517.1. Rule 517.1 requires that the reviewing court substitute its own appraisal of the record where, on review of the "whole record," it is "left with the definite and firm conviction that a mistake has been committed." *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976). If the reviewing court, the Court of Appeals, concludes on its examination of the record that the judgment on appeal is not supported by "competent, material and substantial evidence on the whole record," then it should have a "definite and firm conviction that a mistake has been committed."

Because I am not "left with the definite and firm conviction that a mistake has been committed" by the circuit judge who reviewed the record and the evidence submitted in this case, I would reverse the decision of the Court of Appeals and remand this case to the circuit court for an entry of an order pursuant to its original decision. *Dixon, supra,* p 319.