CLEMENTS *v.* McCABE.

1. MUNICIPAL CORPORATIONS—POLICE POWER AN ATTRIBUTE OF STATE
   SOVEREIGNTY—DELEGATED POWERS.
   The governmental authority known as "police power" is an
   inherent attribute of State sovereignty, and only belongs
   to subordinate governmental divisions when and as con-
   ferred by the State either through its Constitution or con-
   stitutionally authorized legislation.

2. SAME—POLICE POWER FOR PROTECTION OF HEALTH, PERSON AND
   PROPERTY.
   As generally understood, the police power operates in a
   conceded sphere relating to. public safety, order and
   morals for the protection of health, person and property,
   but beyond the comparatively narrow limits of such nec-
   essary implication, the police power, like any other power
   conferred on a municipality, must be expressly delegated
   by the Constitution or legislature of the State.

3. SAME—NO INHERENT POWER IN CITY TO ZONE ITS TERRITORY.
   There exists no inherent power in a city in this State, nor
   can such power be implied from its mere incorporation
   as such, to provide by ordinance for zoning its territory,
   protecting its residential areas from objectionable · busi-
   nesses, etc.

4. SAME—"REGULATE"—"PROHIBIT"—POLICE POWER.
   To "regulate" a business, trade, occupation or amusement
   under the police power contemplates that it may be en-
   gaged in subject to prescribed rules or methods deemed
   essential for public peace, health, and safety, while to
   "prohibit" indicates to prevent or do away with the same
   entirely.

5. SAME—DELEGATED POWERS.
   When such powers are delegated to municipalities by the
   legislature it must be done in express and unmistakable
   terms.

6. SAME—DETROIT CHARTER—ORDINANCES—NO DELEGATED POWER
   TO ZONE ITS TERRITORY.
   Where neither the Constitution nor general act passed pur-

suant to it, providing for the incorporation of cities, have conferred upon them the police power of zoning their territory into areas, an ordinance of the city of Detroit providing for such zoning is void.

Certiorari to Wayne; Hunt (Ormund F.), J. Submitted April 6, 1920. (Calendar No. 29,173.) Decided May 10, 1920.

Mandamus by Charles H. Clements to compel John C. McCabe, commissioner of buildings and safety engineering, and others to issue a building permit. From an order granting the writ, defendants bring certiorari. Affirmed.

*Clarence E. Wilcox,* Corporation Counsel, and *James H. Lee,* Assistant Corporation Counsel (*Edward M. Bassett,* of counsel), for appellants.

*Douglas, Eaman, Barbour & Rogers,* for appellee.

STEERE, J. In this proceeding defendants seek review and reversal of an order of the Wayne county circuit court granting plaintiff a writ of mandamus to compel said defendants John C. McCabe, commissioner of buildings and safety engineering, George Engel, commissioner of public works, and Edward G. Heckel, commissioner of parks and boulevards, to issue him certain permits in accordance with existing municipal regulations of the city of Detroit, authorizing plaintiff to construct an automobile battery service station upon a described lot owned by him in said city.

Said lot fronts 55 feet on West Grand Boulevard and is located just south of Michigan avenue, which is a main thoroughfare and business street of the city. No building restrictions running with the title rest upon said lot limiting the owner's use and enjoyment of the same, nor upon any other lots in the block or

subdivision to which it belongs. Plaintiff desired, and presented an application for, permission to erect on said lot in compliance with the building ordinance or code of Detroit a building to be used as an automobile battery station in which it was proposed to keep, sell and repair automobile storage batteries. It is not disputed that the application was in due form and the planned building fully complied with the building code and all legal ordinances or regulations of the city then in force. It was filed October 21, 1919. A short time previous to his filing said application the common council of Detroit, acting upon a petition presented by certain residents on West Grand Boulevard in the neighborhood of the lot in question, passed a resolution instructing the heads of the three departments named not to issue the permits requested by plaintiff and they refused to do so in compliance with such instruction.

Following their refusal plaintiff filed his petition on October 29, 1919, in the circuit court of Wayne county, asking for a writ of mandamus to compel the issuance of the permits he had applied for, and obtained an order to show cause made returnable November 11, 1919. Defendants made answer thereto denying that "the common council of the city of Detroit is without power to restrain or interfere with the use and enjoyment of real estate in the city of Detroit," and on November 12, 1919, filed an amended answer showing, among other things, that an ordinance was introduced in the common council of the city on November 4th, the same being entitled:

"An ordinance to provide for the zoning for residential purposes of all that portion of the West Grand Boulevard extending from Fort street west, north to Michigan, and within the city of Detroit; to provide for the enforcement of said ordinance; and to provide a penalty for the violation of the terms hereof."

210—Mich.—14.

And on November 19, 1919, an ordinance was passed by the common council of the city, to become effective November 25, 1919, entitled:

"An ordinance to provide for the zoning and protection of certain residential areas within the city of Detroit, and to prevent the location, building, construction, or maintenance of certain designated objectionable businesses in certain areas; to provide for the enforcement of said ordinance; and to provide for a penalty for the violation of the terms hereof."

This ordinance is set out in the pleadings at length, its most material portion being sections 1 and 2 which are as follows:

"SEC. 1. That whenever sixty per cent. (60%) or more of the frontage in any particular block of any street, avenue, boulevard, or public place within the city of Detroit is used exclusively for residential purposes (including the grounds thereof) it shall be deemed and considered a residential zone.

"SEC. 2. From and after the date of this ordinance it shall be unlawful for any person, or persons, firm or corporation to locate, build, construct or maintain any public garage, livery, boarding or sale stables, automobile, battery or accessory service station or other business which is or may be dangerous, offensive or detrimental to the public health, morals, comfort, safety or general welfare of the city of Detroit in any block in which sixty per cent. (60%) of the frontage of said block is used exclusively for residence purposes, including the grounds thereof."

A penalty is provided for violation of said ordinance with a mandate prohibiting departments of the city from issuing permits for erection of the forbidden buildings within such zoned district, concluding with the overworked legislative pronouncement that said ordinance was "immediately necessary for the preservation of the public peace, health and safety and is hereby given immediate effect."

Chapter 10, title 4, of the 1918 charter of the city

of Detroit provides for a "city plan commission" of nine members, to be appointed by the mayor, with various provisions as to its powers and duties, amongst which subdivision (*d*) of section 7 of said chapter provides that it—

"(*d*) Shall formulate a plan to regulate and restrict the location of trades and industries and the location of buildings designed for specific uses, to regulate and limit the height and bulk of buildings hereafter erected, and for such purposes to divide the city into zones in such number, shape and area as may seem best suited to carry out a definite plan for the betterment of the city, and upon its approval and adoption by the common council, shall have the power and authority to enforce its provisions"

Touching the activities of said commission as authorized by the chapter of the charter devoted to that subject, it is said in the trial court's opinion—

"The ordinance in question, so far as it appears, is the first concrete result in the way of legislation. The city plan commission, however, have issued some pamphlets relative to its work from which it appears that most of the time of the commission so far has been spent in making a survey and inventory of the entire situation in Detroit, it being intended ultimately to divide the entire city into zones under classification substantially as follows: (*a*) First residential (single family homes). (*b*) Second residential (flats, apartment houses, hotels, etc.). (*c*) Commercial. (*d*) Industrial. (*e*) Unrestricted (without restriction as to the nature of their use, provided same is not prohibited by law or ordinance)."

We find nothing in the record of this case showing any city plan formulated by the commission under the provision of the charter quoted, upon which the city council acted in passing the ordinance in question; but so far as appears the council was moved to enact it by a petition of certain private property owners on West Grand Boulevard between E street and Michi-

gan avenue, while formulation of a general plan by the commission dividing the city into zones as provided in chapter 10 for the common council to approve and adopt, might with force be urged as a prerequisite to the enactment of a zoning ordinance for the city. That question, however, seems to have been avoided by common consent and upon hearing before the circuit court it was also conceded by counsel that in order to test the validity of said ordinance in its broader aspect it might be considered as having been passed at the time of the hearing.

Testimony was taken upon certain issues of fact framed by stipulation as to the nature of the business of maintaining and operating an automobile battery service station, and under the showing made it was claimed for plaintiff, among other things, that the ordinance was invalid because unreasonable and discriminatory, but the chief contention in his behalf and point made prominent in debate both in that court and here is the right of the municipality to impose such restrictions by a general zoning system upon otherwise unrestricted property within its confines, and the trial court did not deem it necessary to pass upon any issues of fact presented or contentions of counsel in relation thereto and granted the writ of mandamus asked, filing an opinion in which it was held that under the undisputed facts the common council of the city of Detroit was without authority to enact such ordinance; that as the law now stands in this State the zoning power assumed to be exercised by the common council does not exist, because not expressly conferred upon the city by either the so-called "home-rule" provision of our Constitution or by the supplemental legislation passed pursuant thereto, providing for incorporation of cities and revising or amending their charters. Referring to that portion of article 8 of our present Constitution which deals

with "cities and villages," and legislation subsequently enacted for their incorporation in compliance with its requirements the court pursued the subject in part as follows:

"Under the Constitution of the State the legislature alone is the reservoir of power to enact laws. It is true that the legislature may delegate it to the several municipal authorities, and the question arises, Has the legislature unmistakably delegated these powers to cities generally in this State, or to the common councils thereof?

"The Constitution of Michigan, article 8, § 20, provides, among other things:

" 'The legislature shall provide by a general law for the incorporation of cities.' * * *

"Section 21:

" 'Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter and to amend an existing charter of the city or village heretofore granted or passed by the legislature for the government of the city or village, and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this State.'

"In section 22 cities and villages are given permission to acquire, own, establish and maintain parks, boulevards, cemeteries, hospitals, almshouses and all works which involve the public health or safety.

"Section 23 provides, among other things:

" 'Subject to the provisions of this Constitution, any city or village may acquire, own and operate public utilities for supplying water, light, heat, power and transportation,' etc.

"Section 24 relates to the powers of a city or village, to issue mortgage bonds.

"Section 28, among other things, provides:

" '* * * The right of all cities, villages and townships to the reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and townships.'

"A careful search of the Constitution fails to reveal

any special provision delegating to cities the power to regulate, control or restrict the use of real estate as provided by the ordinance in question.

"Turning now to the home-rule act, so-called, being Act No. 279, Pub. Acts 1909, as amended (1 Comp. Laws 1915, § 3304), we have searched in vain to find any special provisions delegating to cities the power to regulate, control or restrict the use of real estate as provided by the ordinance in question. If such power exists, it must be by implication."

After some further reference to the act the learned circuit judge expressed "sympathy with the aims, purposes, practicability and necessity of legislation sought by the city plan commission of Detroit," of which he had made a study, but arrived at the conclusion that enabling legislation to that end was requisite and the ordinance invalid, citing as impelling to that view *City of Kalamazoo* v. *Titus*, 208 Mich. 252, applying it as follows:

"It is true that the subject-matter in that case is quite distinct from the one now under consideration, but the principle involved is identical, the question there being as to whether under the Constitution and home-rule act the matter of regulating gas rates had been specifically delegated to the city. It was argued in behalf of the city that Kalamazoo had adopted a charter by referendum which conferred this power, but the Supreme Court held that there seemed to be a popular misunderstanding about the subject of home rule and, in effect, held that a city could not adopt a charter and thereby obtain any extension or enlargement of the subject of municipal legislation and control except as those subjects and powers are specifically enumerated and designated in the Constitution itself and in the home-rule act."

In behalf of this city it is contended that this ordinance is a valid initiatory step in a proposed zoning system of the entire city under its charter provision quoted, taken in the exercise of that elastic and well known but as yet not well defined or clearly circumscribed governmental attribute termed "police power,"

with which the city is endowed both by constitutional provision and legislative enactment. This is claimed to have been derived from three sources or through three channels, to wit, *first,* conferred by implication from the bare fact of its creation as a municipality, even prior to and independent of the home-rule act or our present Constitution, the *second,* by section 21, article 8, of the Constitution itself giving to each city authority to adopt or amend its charter after the enactment of a general law upon the subject, and to pass ordinances "relating to its municipal concerns," and, *third,* by the language of the home-rule act.

Counsel on each side of the controversy have favored us with able and helpful briefs which both well debate the direct and controlling question involved, and in their amplifications also instructively lead far afield into the merits of the zoning system and along the less trodden ways on the outposts of police power, but, as we are constrained to view it, many of the alluring questions discussed are beyond the purview of the issue before us for determination at the present time.

The governmental authority known as "police power" is concededly an inherent attribute of State sovereignty. It only belongs to subordinate governmental divisions when and as conferred by the State either through its Constitution or constitutionally authorized legislation. As generally understood it operates in a conceded sphere relating to public safety, order and morals for the protection of health, person and property, which is never questioned; but with changing conditions and requirements of our modern civilization, increasing regulatory and restrictive legislation has expanded its application to new subjects and demands presenting a debatable sphere where compulsory control borders the line of claimed constitutional rights and private freedom of action.

We may admit that the legal incorporation and organization of a city for local governmental purposes necessarily invests it with certain primary police powers within the conceded sphere of such power fundamentally essential to the ends for which it was created. But beyond the comparatively narrow limits of such necessary implication the police power, like any other power conferred on a municipality, must be expressly delegated by the Constitution or legislature of the State.

The assumed power of the city to zone its territory according to the extensive project in so-called "municipal evolution" indicated by this ordinance is yet clearly within the debatable sphere of police power. No such inherent zoning power exists or can be implied in this State from the mere incorporation of a city as such.

Of the invoked constitutional and legislative authority it may first be noted that no hint of recognition of any scheme for municipal evolution on a general zoning basis is manifested by direct mention of the subject or suggestive wording pointing in that direction. It is beyond question that, when the people of this State adopted their Constitution, police power was placed in the legislature, except as distinctly reserved or conferred elsewhere. The constitutional provision conferring upon cities a greater degree of governmental independence in their strictly local concerns and the right under certain conditions to adopt, revise and amend their charters is not framed as a self-executing provision, but contemplates, and requires, that the legislature shall supplement it by enactment of a general law for the incorporation of cities. Upon the scope of such law only a few definite constitutional limitations are set, with certain enumerated rights given to cities when so incorporated. The right contended for here is not amongst those specified.

In support of the contention that the police power invoked was directly delegated to cities by the Constitution, counsel point to the provision in section 21. of article 8 authorizing a city to pass all laws and ordinances "relating to its municipal concerns," and assert, truthfully, that these words are "very broad." They are also very general and indefinite words which cannot fairly be construed to plainly designate in concrete terms, or even suggest, a direct constitutional grant of power to cities of such unusual scope and far-reaching possibilities as the yet in many respects debatable police power sought to be exercised in the proposed zoning plan.

To whatever extent this proposed zoning system may be desirable and might prove feasible, power to enforce it is not a necessary power yet recognized as essential to local government. Upon defendant's theory that police power to that extent is a direct grant to the city from the Constitution the following reflections in *City of Kalamazoo* v. *Titus, supra,* are significant:

"The impressive thing about these constitutional provisions (in article 8) is that they recognize and affirm the theory that cities owe their origin and their powers to the legislature. And while cities may refer power to do some things as, for example, power to acquire certain public works, directly to some of these constitutional provisions, it must be admitted that all of these provisions should be considered with reference to the fact that legislative power is vested in the legislature and that the Constitution recognizes, as former Constitutions have recognized, the general control of the legislature over cities."

Neither is this unusual and yet debatable police power claimed specifically designated in the so-called "home-rule" act itself, passed in compliance with the constitutional mandate (Act No. 279, Pub. Acts 1909), as originally enacted or subsequently amended, and

what has been said of the necessity that such power must be expressly granted is equally applicable to constitutional provision or legislative enactment and need not be repeated. The following language of that por-tion of the act outlining what each city charter shall or may provide is emphasized as impliedly conferring the zoning power claimed:

"SEC. 3. Each city shall provide: * * * (g) For the public peace and health and for the safety of persons and property; * * *

"SEC. 4. Each city may in its charter provide: * * * (d) For the regulation of trade, occupations and amusements within its boundaries, and for the regulation and restriction of the territory within which saloons where intoxicating liquors are sold at retail, may be located, but no charter shall permit the sale of such liquors in any county where such sale is prohibited by operation of the general local option law of the State."

The mandate in section 3 to provide for guarding the public peace and health, and protecting the safety of persons and property, is but a recognition of those unquestioned police powers essential to the purposes for which municipal corporations are created, expressed in the customary legislative phraseology upon that subject with which courts are familiar.

The restriction in section 4 of territory in which a specified business may be conducted is limited to the sale of intoxicating liquors at retail, and the regulation of trade, occupations or amusements, cannot fairly be said to specifically authorize their entire prohibition on otherwise unrestricted private property as the proposed zoning system contemplates. To regulate a business, trade, occupation or amusement under the police power contemplates that it may be engaged in subject to prescribed rules or methods deemed essential for public peace, health and safety, while to prohibit indicates to prevent or do away with the same

entirely. The distinction between the power "to regulate" and "to prohibit" is pointed out in *People* v. *Gadway*, 61 Mich. 285; *In re Hauck*, 70 Mich. 396. When such powers are delegated to municipalities by the legislature it must be done in express and unmistakable terms. *Traverse City* v. *Railroad Commission*, 202 Mich. 575; *City of Kalamazoo* v. *Titus, supra*.

It is not deemed advisable to review nor necessary to pass upon the many other interesting and far-reaching questions suggested by this ordinance and the charter provision claimed to authorize it which counsel raise and argue. As well said by counsel for the defense, this is a larger issue than the validity of the ordinance before us which is not to be "tested merely by its effect upon relator's piece of property," and "involves its effect on the entire community." The controlling test is whether by any adequate, definite provision in the Constitution or general act passed pursuant to it cities have been vested with this evolutionary and comprehensive police power of zoning asserted here. Independent of legislation, the Constitution confers no such grant of power directly upon cities. Assuming, but not deciding, that such power is by the Constitution committed to the legislature, it has not by express grant in adequate terms delegated the same to cities.

For these reasons we are constrained to agree with the negative conclusion reached upon that question by the trial court, and its order granting the writ of mandamus prayed for will stand affirmed.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.