KYSER v KASSON TOWNSHIP

Docket Nos. 272516 and 273964. Submitted March 11, 2008, at Lansing. Decided May 6, 2008, at 9:00 a.m. Leave to appeal sought.

Edith Kyser brought an action in the Leelanau Circuit Court against Kasson Township, alleging that the defendant's refusal to rezone her property from agricultural use and to include it in the defendant's district that permits gravel-mining operations should be held to be invalid and unconstitutional. Following a bench trial, the court, Thomas G. Power, J., entered an order permitting the plaintiff to mine gravel on her property and enjoining the defendant from interfering with the plaintiff's gravel-mining operation. The defendant appealed that order, and the plaintiff appealed the court's order that denied the plaintiff's requests for awards of costs and sanctions against the defendant. The appeals were consolidated.

The Court of Appeals *held*:

1. A more rigorous standard of reasonableness applies when reviewing zoning regulations that would prevent the extraction of natural resources because of the important public interest in extracting and using natural resources. Zoning regulations that prevent the extraction of natural resources are invalid unless "very serious consequences" will result from the proposed extraction.

2. A party, to successfully challenge a zoning ordinance that prevents the extraction of natural resources, must show that there are valuable natural resources located on the land and that no "very serious consequences" could result from the extractions of the resources.

3. The trial court did not err in determining that the gravel on the plaintiff's land was a valuable natural resource. The record also supports the trial court's factual determination that the plaintiff sufficiently established that no "very serious consequences" would result from the proposed gravel-mining operation.

4. The circuit court did not clearly err in determining that the public interest in the plaintiff's gravel was not high and that,

therefore, the plaintiff was required to make a stronger showing that no "very serious consequences" would result from the proposed gravel operation.

5. The trial court correctly determined that the mere presence of some consequences would not be sufficient to deny the plaintiff's request to mine gravel, as long as those consequences were not "very serious" in nature.

6. The trial court did not err in concluding that the concerns regarding truck safety and increased truck traffic, the concerns regarding increased traffic noise and the possible decrease in property values, and the concerns regarding possible adverse effects on nearby residential development did not rise to the level of "very serious consequences." The trial court did not clearly err in determining that allowing the plaintiff's proposed gravel-mining operation would not undermine the intent and the purpose of the defendant's gravel district or create a domino effect rising to the level of a "very serious consequence." The order enjoining the defendant from interfering with the plaintiff's right to mine gravel on her property must be affirmed.

7. The trial court did not abuse its discretion by granting the plaintiff's motion in limine to exclude evidence concerning the suitability of the plaintiff's property for uses other than gravel mining.

8. The trial court did not err in denying the plaintiff's request to tax costs on the basis that a public question was involved in the case.

9. The defendant's failure to admit before trial that the proposed gravel-mining operation would present no serious traffic-safety issues was not unwarranted at the time the request for admission was made. The trial court did not abuse its discretion by denying the plaintiff's motion to sanction the defendant for its failure to admit this fact.

Affirmed.

DAVIS, J., concurring in part and dissenting in part, concurred in the decision to affirm the denial of the motion for sanctions, but dissented from the decision to affirm the order permitting gravel mining. The "very serious consequences" rule applicable to zoning ordinances that affect natural-resource extraction concerns a matter of zoning and must be viewed in that context. When the history regarding the defendant's establishment of the gravel district and the public policy of the state giving deference to zoning in general are both considered, it is apparent that the gravel district is presumptively valid and the plaintiff has the burden of

proving otherwise. The test is whether the zoning ordinance is confiscatory or arbitrary, not only with regard to the plaintiff's desire to exploit the natural resources on her land, but also with regard to the community's need to have the natural resources exploited. The analysis must also consider the negative implications to the community caused by the exploitation, where the exploitation is contrary to duly enacted zoning regulation. The individual findings of fact by the trial court were not clearly erroneous; however, under the circumstances presented in this case, the trial court failed to properly recognize that those circumstances constituted "very serious consequences." The plaintiff failed to make the requisite showing that there were not "very serious consequences." The order permitting gravel mining should be reversed.

1. ZONING — NATURAL RESOURCES EXTRACTION.

A more rigorous standard of reasonableness applies when reviewing zoning regulations that would prevent the extraction of natural resources; there is an important public interest in extracting and using natural resources; therefore, zoning regulations that prevent such extraction are invalid unless "very serious consequences" will result from such extraction.

2. ZONING — NATURAL RESOURCES EXTRACTION.

A party, to successfully challenge a zoning ordinance that prevents the extraction of natural resources, must show that there are valuable natural resources on the plaintiff's land and that no "very serious consequences" would result from the extraction of the resources; the plaintiff must make a stronger showing that no "very serious consequences" would result where the public interest in the natural resources is not high.

*Olson, Bzdok & Howard, P.C.* (by *Christopher M. Bzdok* and *Michael C. Grant*), for the plaintiff.

*Running, Wise & Ford, P.L.C.* (by *Richard W. Ford* and *Thomas A. Grier*), for the defendant.

Amici Curiae:

*Warner Norcross & Judd LLP* (by *Kenneth W. Vermeulen* and *John J. Bursch*) for the Michigan Aggregates Association.

*Gerald A. Fisher* and *Richard Norton* for the American Planning Association and the Michigan Association of Planning.

*Bauckham, Sparks, Rolfe, Lohrstorfer & Thall, P.C.* (by *John H. Bauckham* and *Scott D. Basel*), for the Michigan Townships Association.

Before: WHITBECK, P.J., and JANSEN and DAVIS, JJ.

JANSEN, J. Following a bench trial, the circuit court entered an order permitting plaintiff to mine gravel on her property and enjoining defendant from interfering with plaintiff's gravel-mining operation, notwithstanding a township zoning ordinance that purported to disallow gravel mining on plaintiff's land. The circuit court also denied plaintiff's requests for costs and sanctions against defendant. Both parties now appeal as of right, we consolidate the appeals, and we affirm.

I

The salient facts of this case are not in serious dispute. Significant gravel deposits underlie defendant Kasson Township. Between 1988 and 1994, defendant experienced considerable internal strife brought about by zoning disputes and other legal battles waged over the issue of gravel mining. After a lengthy period of planning and public discussion, defendant attempted to resolve its gravel-related problems by adopting a zoning ordinance that established a township gravel district. Under the ordinance, gravel mining and extraction operations were to be permitted inside the gravel district, but were not to be permitted outside the gravel district.

Plaintiff owns a parcel of real property in Kasson Township. Although plaintiff's property abuts the

gravel district, her land, itself, was originally zoned for agricultural use. Plaintiff sought to have a portion of her property rezoned and included in the gravel district, with the ultimate goal of selling the rezoned portion to a gravel-mining operator. Defendant refused to grant plaintiff's rezoning request, citing the comprehensive nature of its zoning concerning the gravel district. Among other things, defendant asserted that plaintiff's requested rezoning would undermine the zoning scheme and result in a "domino effect" by "spark[ing] cumulative rezonings"—in effect, leading to numerous other requests to allow gravel mining on land located outside the gravel district.

Plaintiff sued in circuit court, arguing that defendant's refusal to rezone her property should be held invalid and unconstitutional. The matter proceeded to a bench trial. Plaintiff moved in limine to prevent the introduction of evidence concerning the suitability of her property for uses other than gravel mining. The circuit court granted the motion. At trial, the court admitted considerable evidence and heard the testimony of several witnesses. The circuit court thereafter made extensive findings of fact, specifically finding that plaintiff's requested rezoning would not result in "very serious consequences" and ruling as a matter of law that plaintiff was entitled to mine gravel on her land. The circuit court enjoined defendant from enforcing its agricultural zoning classification against plaintiff's land and from interfering with plaintiff's right to mine gravel on her property.

II

We review for clear error the circuit court's findings of fact following a bench trial, but review de novo the circuit court's conclusions of law. *Chapdelaine v Soch-*

*ocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). A finding is clearly erroneous if, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Heindlmeyer v Ottawa Co Concealed Weapons Licensing Bd*, 268 Mich App 202, 222; 707 NW2d 353 (2005). We review for an abuse of discretion the circuit court's grant of injunctive relief. *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 105; 662 NW2d 387 (2003). We also review for an abuse of discretion the circuit court's decision to admit or exclude evidence. *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 188; 600 NW2d 129 (1999). Finally, we review for an abuse of discretion the circuit court's ruling on a motion to tax costs under MCR 2.625, *Klinke v Mitsubishi Motors Corp*, 219 Mich App 500, 518; 556 NW2d 528 (1996), and the circuit court's decision whether to award sanctions under MCR 2.313(C), *Phinisee v Rogers*, 229 Mich App 547, 561-562; 582 NW2d 852 (1998). An abuse of discretion occurs when the court chooses a decision that falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

III

In Docket No. 272516, defendant argues that the circuit court made several erroneous findings of fact and that it consequently erred by determining that plaintiff's proposed gravel-mining operation would not result in "very serious consequences." We disagree.

The general rule in Michigan is that " '[a] zoning ordinance will be presumed valid, with the burden on the party attacking it to show it to be an arbitrary and unreasonable restriction upon the owner's use of his

property.' " *Kirk v Tyrone Twp*, 398 Mich 429, 440; 247 NW2d 848 (1976), quoting *Nickola v Grand Blanc Twp*, 394 Mich 589, 600; 232 NW2d 604 (1975) (WILLIAMS, J.). However, "because of the important public interest involved in extracting and using natural resources, a more rigorous standard of reasonableness applies when reviewing zoning regulations that would prevent the extraction of natural resources." *American Aggregates Corp v Highland Twp*, 151 Mich App 37, 40; 390 NW2d 192 (1986); see also *Silva v Ada Twp*, 416 Mich 153, 158-159; 330 NW2d 663 (1982). "The courts have particularly stressed the importance of not destroying or withholding the right to secure oil, gravel, or mineral from one's property, through zoning ordinances, unless some *very serious consequences* will follow therefrom." *North Muskegon v Miller*, 249 Mich 52, 57; 227 NW 743 (1929) (emphasis added); see also *Bloomfield Twp v Beardslee*, 349 Mich 296, 310-311; 84 NW2d 537 (1957) (BLACK, J., concurring). Stated another way, "zoning regulations which prevent the extraction of natural resources are invalid unless 'very serious consequences' will result from the proposed extraction." *Silva, supra* at 156; see also *Certain-teed Products Corp v Paris Twp*, 351 Mich 434, 467; 88 NW2d 705 (1958) (BLACK, J., concurring in part and dissenting in part). Accordingly, to successfully challenge a zoning ordinance that prevents the extraction of natural resources, a party must show (1) "that there are valuable natural resources located on the land" and (2) "that no 'very serious consequences' would result from the extraction of the resources." *American Aggregates, supra* at 41.

A

Turning to the case at bar, the circuit court first found that the gravel underlying plaintiff's land was a

valuable natural resource. The circuit court remarked that "[plaintiff's] property contains a gravel deposit of good space and good quality" and determined that gravel mining on plaintiff's land "would be financially a successful operation." We conclude that the record supported this finding. "The proper focus in determining whether the natural resource is valuable is on whether the landowner, by extracting the resource, can raise revenues and reasonably hope to operate at a personal profit." *Id.* "[G]ravel is used extensively in construction and . . . Michigan courts have often recognized the value of this natural resource." *Id.* at 42. The evidence presented in this case established that plaintiff's land was underlain by high-quality gravel and that this gravel could be extracted and sold at a profit. The circuit court did not clearly err by finding that the gravel located on plaintiff's land was a valuable natural resource. *Id.* at 41-42.

B

The circuit court also determined, after making several individual findings of fact, that plaintiff had sufficiently established that no "very serious consequences" would result from the proposed gravel-mining operation. The record supported this factual determination as well.

1

The circuit court first analyzed the degree of public interest in the gravel underlying plaintiff's property. As this Court observed in *American Aggregates, supra* at 44, the degree of public interest in a valuable natural resource should be considered when determining whether extraction of the resource will result in "very serious consequences":

[W]e believe that the degree of public interest in the landowner's specific natural resource should be considered when analyzing whether "very serious consequences" to the community will result from the extraction of the natural resource. This will result in a sliding scale determination of whether "very serious consequences" exist in the landowner's specific situation. If public interest in the specific landowner's resource is very high, the consequences resulting from the extraction of the resource will not reach the level of "very serious" as readily as in the case where public interest in the specific resource is relatively low.

This type of sliding scale approach based on the public interest in the landowner's specific resource results in an appropriate cost/benefit analysis in applying the *Silva* standard for determining the reasonableness of zoning regulations preventing the extraction of natural resources.

The evidence presented at trial indicated that there was substantial gravel underlying much of Kasson Township and that much of the township's land had not yet been mined. Defendant's expert testified that there were approximately 78 million tons of gravel remaining beneath those parts of the gravel district that were currently being mined, and another 58 million tons of gravel underlying those parts of the gravel district that were not currently being mined. Plaintiff's expert did not fully concur with these data, testifying that there was somewhat less gravel than defendant's expert had indicated. Nonetheless, plaintiff's expert agreed that there was a significant amount of gravel remaining in the township's gravel district.

On the basis of this evidence, the circuit court found that there was no immediately pressing need for the gravel underlying plaintiff's land and that "the public interest in [plaintiff's] gravel is not high." The court determined that, pursuant to *American Aggregates*, plaintiff was consequently required to "make a stronger

showing . . . that there are no very serious consequences from her [proposed] gravel operation." The circuit court did not clearly err in this regard. The record fully supported the circuit court's determination that the public interest in plaintiff's gravel was not high, and the circuit court therefore properly concluded that it was incumbent on plaintiff to "make a stronger showing" that no very serious consequences would result from her proposed gravel operation. *Id.* at 44.

2

The circuit court also examined the meaning of the phrase "very serious consequences." As the circuit court correctly observed, it was plaintiff's burden to establish that no "very serious consequences" would result from her proposed gravel operation; however, plaintiff was *not* required to prove that no consequences whatsoever would result from her proposed gravel operation. The circuit court correctly explained that the mere presence of *some* consequences would not be sufficient to deny plaintiff's request to mine gravel, as long as those consequences were not "very serious" in nature.

3

The circuit court then went on to discuss the five potential "very serious consequences" that were identified in this case, which included (1) truck safety and traffic, (2) traffic noise, (3) loss of property values, (4) effect on residential development, and (5) the "domino effect."

a

The circuit court first found that the identified truck-safety and increased-traffic concerns did not rise to the level of "very serious consequences" in this case.

The court noted that plaintiff's property had approximately a quarter-mile of frontage on M-72 and that "at that location there are excellent sight distances." Defendant's own traffic expert believed that a driveway at that location would be safe and that the Michigan Department of Transportation would likely approve a direct driveway onto M-72 from plaintiff's land. The court observed that "M-72 is a main road .... And indeed gravel traffic already uses M-72." Given the potential of a direct entrance onto plaintiff's land from M-72, the court found that there was not "a traffic safety issue" in this case. Further, on the basis of the evidence that numerous other gravel carriers already used the M-72 corridor, the court found that there would be only "a modest net increase in truck traffic on M-72." The circuit court did not err by finding that the generalized concerns regarding truck safety and increased truck traffic in this case did not constitute "very serious consequences."

b

The circuit court next found that the concerns regarding increased traffic noise did not rise to the level of "very serious consequences." The court observed that "M-72 ... already has a lot of traffic noise." The court found that, for the most part, individuals living at some distance from plaintiff's property would hear little or no more noise than they already experienced. In contrast, the court did find that there would be increased traffic noise for the few residents living near plaintiff's proposed entrance onto M-72. Indeed, one witness testified that when he is in his orchard south of M-72, he can hear truck noise from an already-existing gravel operation approximately a half-mile away. However, the court considered it significant that all but one of the nearby

residents did not oppose plaintiff's proposed gravel operation and that there was no evidence concerning the wishes of the remaining resident. In sum, although the circuit court found that there would be some increase in truck noise, especially for plaintiff's closest neighbors, the court determined that this increase in noise for the few nearby residents would not rise to the level of a "very serious consequence." We cannot conclude that this determination was clearly erroneous.

c

Third, the circuit court found that the possible decrease in property values in the area of plaintiff's land did not constitute a "very serious consequence." Defendant's expert opined that residential parcels surrounding plaintiff's land would suffer losses in value of between 17 and 76 percent as compared to similar residential parcels not located in the gravel district. The expert further opined that vacant parcels surrounding plaintiff's property would suffer losses in value of about 30 percent as compared to similar vacant parcels not located in the gravel district. The circuit court acknowledged the expert's testimony in this regard, but concluded that it was not reliable or worthy of belief. Specifically, the court stated:

> I do not believe this was a reliable study. The cross-examination poked a lot of holes in [the expert's study of the value of comparable properties]. The comparables were generally poorly selected and not very comparable, and then badly adjusted on the residential study. And the adjustments always seemed to be . . . intended to make it look like the comparable sales outside the district were for more than they probably were worth.

The circuit court specifically cited instances in which the expert appeared to have undervalued or overvalued

certain comparable parcels, depending on whether those parcels were inside or outside the gravel district. The court pointed to the testimony of another witness, who opined that any decrease in property values would be limited to the immediate area within a half-mile radius of plaintiff's proposed gravel mine. The court also pointed to the fact that many of plaintiff's neighbors did not oppose the proposed gravel operation. As the court observed:

> By and large people have a pretty good idea what their property is worth and what's going to happen if something occurs nearby. And the fact that the people that own the property, most of whom appear to be sophisticated owners, . . . don't perceive this as a problem is pretty good evidence that it's not going to have an effect on the value of their property.

The circuit court was entitled to weigh the experts' differing opinions concerning property values. *American Aggregates, supra* at 50. We defer to the circuit court's superior opportunity to observe and evaluate the credibility of the witnesses who testified before it. *Marshall Lasser, PC v George*, 252 Mich App 104, 110; 651 NW2d 158 (2002). Moreover, as the circuit court acknowledged, the valuation testimony of defendant's expert was not uncontested. Indeed, competing evidence suggested that the value of surrounding properties would *not* be adversely affected by plaintiff's proposed gravel-mining operation. The circuit court did not clearly err by determining that the possibility of decreased property values in the area of plaintiff's land did not constitute a "very serious consequence" in this case.

d

The circuit court next considered certain concerns regarding the effect of plaintiff's proposed gravel mine

on residential development in the area. One witness testified that his family members, who own significant agricultural property in the vicinity of plaintiff's land, believed that it would be better to have gravel mining adjacent to their orchards than to have residential use adjacent to their orchards. The witness explained that although his family members owned considerable property in the area, they did not oppose plaintiff's proposed gravel-mining operation. In contrast, another individual who owned undeveloped land on the south side of M-72 opined that gravel mining would be destructive of her ultimate plan to subdivide her property and sell the resulting lots for residential use. The circuit court recognized that plaintiff's proposed gravel-mining operation "might have some" adverse effect on that individual's planned land use. However, as the circuit court noted, the landowner had taken no present or concrete steps toward subdividing her land, merely wishing to do so at some point in the future. She had made no request to split her property and she had made no attempts to commence the land-division process. In fact, as the court observed, the landowner's ultimate goal of building a residential subdivision would require the construction of access roads over property that she did not even own. The circuit court determined that the landowner's plan was tentative at best, "strictly abstract," and "very long term." The court also noted that any residential development that might take place on the landowner's property in the future would require substantial setbacks, and that houses on the property would therefore be screened from the traffic and noise of M-72.

The circuit court also examined the potential effect on the property of other nearby residents. Most of plaintiff's closest neighbors did not oppose the proposed gravel-mining operation, and some had even signed statements supporting plaintiff's requested rezoning.

The court did find that one family's property would "undeniably . . . be seriously affected if [plaintiff's] property is developed as a gravel mine." Because this family's property was so near to plaintiff's land, the court concluded that it was "almost inevitable [that] the effect on their property will be large, even with the 300 foot setback from their house that the county ordinance would provide." The court also determined that the value of the family's home would almost certainly be adversely affected.

Finally, the court observed that there were residential subdivisions in the general area, but noted that all of them were approximately a half-mile or more from plaintiff's property. The court again pointed to the testimony of one of the real estate experts, who opined that any decrease in property values would likely be limited to the immediate area within a half-mile radius of plaintiff's proposed gravel mine.

On the basis of all the evidence before it, the circuit court determined that there would be some effect on residential development in the area of plaintiff's land but remarked that this effect could be significantly lessened through compliance with the relevant zoning ordinance. The court noted that the relevant zoning ordinance required setbacks that would "reduce significantly . . . the effects of the mining operation." The court also noted that the effects of the mining operation could be lessened through the planting of trees and the use of "[b]erms [and] vegetation to protect [against] sound and absorb sound and dust . . . ."[1] In short,

---

[1] The circuit court also imposed reasonable time restrictions on plaintiff's proposed gravel-mining operation in order to ensure that property values and nearby residential developments would not be adversely affected by truck noise. The court limited gravel mining on plaintiff's land to normal business hours "so that work does not occur after most people get home from work and kids get home from school." The court

although the circuit court found that there would be some negative effects on nearby residential developments, it determined that "these are not very serious consequences for the individuals or for the future of the Township's development." The circuit court did not clearly err by holding that the limited adverse effects on nearby residential development would not rise to the level of "very serious consequences."

e

Lastly, the circuit court considered defendant's contention that allowing plaintiff's proposed gravel-mining operation to proceed would result in a "domino effect," leading to numerous other requests to allow gravel mining on land located outside the gravel district. Defendant argued that the gravel district had been formed only after extensive planning and citizen input and that allowing new additions to the district would undermine the township's zoning scheme and compromise the purpose of the gravel district itself. However, the circuit court observed that the gravel district "isn't necessarily set in stone," and noted that the township board had voted on at least one previous occasion to allow the addition of new land to the gravel district.[2] The circuit court also pointed to the testimony of defendant's own planning expert, who testified that the gravel district did not necessarily include the lands with the highest-quality gravel. The expert explained that whereas some areas with high-quality gravel were not included in the district, other areas with low-quality

ordered that "[t]here will be no mining on the site after 5:30 [p.m.]." We do not disturb these reasonable time restrictions on appeal.

[2] Although this addition of new land to the gravel district was apparently approved by a plurality of the township board, the addition was never carried out because a quorum of the board was not present when the vote was taken.

gravel were included in the district. On the basis of this testimony, the court found that "it is not at all clear that [the gravel d]istrict is necessarily the ideal district. And—and maybe additions to it from time to time [are] not necessarily a bad idea."

The court also addressed defendant's concern that "the whole of Kasson Township" would "becom[e] a gravel pit." The circuit court noted that the gravel district already had defensible and well-defined boundaries on the north, east, and west. The court noted that these boundaries were not generally susceptible to alteration or expansion because of the presence of National Park Service land near the western boundary and because of the low-quality nature of the gravel deposits beyond the northern and eastern boundaries. The court determined that the only likely area of expansion was along the gravel district's southern boundary, near M-72 and plaintiff's property, where the quality of the gravel was relatively high but the lands had not been included in the gravel district as initially established. Consequently, although the circuit court recognized the possibility of future justifiable expansion of the gravel district on its southern edge, it found that the gravel district would not likely expand to the north, east, or west. The court determined that there was a low probability that the whole of Kasson Township would be transformed into a gravel mine.

The circuit court determined that allowing plaintiff's proposed gravel-mining operation would not undermine the intent and purpose of the township's gravel district or create a "domino effect" rising to the level of a "very serious consequence." We cannot conclude that the court's findings in this respect were clearly erroneous.

4

In sum, the circuit court determined that "Plaintiff has made a strong showing that there are not very [serious] consequences . . . ." After reviewing the entirety of the evidence presented at trial, we conclude that this determination was not clearly erroneous. See *Heindlmeyer, supra* at 222. Although certain evidence established that *some* adverse effects might result from plaintiff's proposed gravel-mining operation, these limited adverse effects simply did not rise to the level of "very serious consequences" in this case. The circuit court did not clearly err by holding that plaintiff had established that no "very serious consequences" would result from her proposed gravel-mining operation.

C

The circuit court correctly found that the gravel underlying plaintiff's land was a valuable natural resource and that plaintiff had sufficiently shown that her proposed gravel-mining operation would not cause "very serious consequences." In light of these factual findings, the circuit court correctly ruled as a matter of law that plaintiff was entitled to engage in gravel mining and extraction on her property. *Silva, supra* at 156; *American Aggregates, supra* at 41. We affirm the circuit court's order enjoining defendant from interfering with plaintiff's right to mine gravel on her property, subject to the reasonable time limitations imposed by the court. See *Higgins Lake Prop Owners, supra* at 105. The specific form of injunctive relief granted by the circuit court in this case fell soundly within the range of reasonable and principled outcomes. *Maldonado, supra* at 388.

IV

Also in Docket No. 272516, defendant argues that the circuit court abused its discretion by granting the motion in limine to exclude evidence concerning the suitability of plaintiff's property for uses other than gravel mining. We cannot agree. As defendant points out, this Court did remark in *American Aggregates* that the plaintiff's land was valuable for uses other than sand and gravel extraction. *American Aggregates, supra* at 46. However, the fact that the plaintiff's land in that case was suitable for uses other than sand and gravel mining was relevant only to the determination of the degree of public interest in the plaintiff's natural resources. *Id.* at 46-47.

The circuit court in the present case properly concluded that there was low public interest in plaintiff's gravel, but nonetheless determined that no "very serious consequences" would result from plaintiff's proposed gravel-mining operation. Any evidence concerning the suitability of plaintiff's property for uses other than gravel mining would have been merely cumulative to the other evidence that already tended to establish a low public interest in plaintiff's resources. In other words, introduction of additional evidence concerning the low public interest in plaintiff's gravel would have been futile. Therefore, even assuming arguendo that the circuit court erred by excluding evidence concerning the suitability of plaintiff's property for other uses, any error in this regard was harmless and did not affect the outcome of the proceedings. It is well settled that we do not reverse on the basis of harmless error. *Ypsilanti Fire Marshal v Kircher (On Reconsideration)*, 273 Mich App 496, 529; 730 NW2d 481 (2007).

V

In Docket No. 273964, plaintiff argues that the circuit court erred by denying her request to tax costs as the prevailing party. We disagree.

After trial, plaintiff filed a bill of costs with the circuit court. Defendant responded by filing objections to the bill of costs. The circuit court acknowledged that plaintiff had prevailed at trial, but nonetheless denied plaintiff's request for costs on the ground that a "public question" had been involved in this matter.

In general, "[c]osts will be allowed to the prevailing party in an action, unless prohibited by statute or by these rules or unless the court directs otherwise . . . ." MCR 2.625(A)(1); see also *Ullery v Sobie*, 196 Mich App 76, 82; 492 NW2d 739 (1992). "Michigan courts frequently refuse to award costs in cases involving public questions," and "this Court has specifically refused to award costs in landowners' suits challenging the constitutionality of zoning ordinances as applied to their property, since such cases involve public questions." *American Aggregates*, *supra* at 54. Because this case directly involved a "public question," *id.*, the circuit court did not abuse its discretion by denying plaintiff's request to tax costs, *Klinke*, *supra* at 518.

VI

Also in Docket No. 273964, plaintiff argues that the circuit court abused its discretion by declining to sanction defendant under MCR 2.313(C) for failing to admit before trial that the proposed gravel-mining operation would present no serious safety issues. Again, we disagree.

One party may request admissions from the other party before trial. MCR 2.312(A). The purpose of MCR

2.312 is to limit areas of controversy and to save time, energy, and expense that would otherwise be required to prove the matters that are subject to the request for admission. See *Janczyk v Davis*, 125 Mich App 683, 692; 337 NW2d 272 (1983). If a party fails to admit a fact as requested, and if the party requesting the admission later proves that fact at trial, the requesting party may move for sanctions against the other party. MCR 2.313(C). The court must grant the motion for sanctions unless it determines that one of the exceptions stated in MCR 2.313(C) applies.

The mere fact that an issue is proven at trial does not necessarily mean that the refusal to admit it before trial was unwarranted at the time. *Richardson v Ryder Truck Rental, Inc*, 213 Mich App 447, 457; 540 NW2d 696 (1995). Indeed, the court may not sanction a party for failing to admit a fact if it finds that "the party failing to admit had reasonable ground to believe that he or she might prevail on the matter[.]" MCR 2.313(C)(3). As this Court has recognized, "unless a matter is completely free of controversy, it is not likely that a formal request for admissions will prove successful." *Greenspan v Rehberg*, 56 Mich App 310, 328; 224 NW2d 67 (1974).

We conclude that defendant's failure to admit that plaintiff's proposed gravel-mining operation would cause no serious traffic-safety issues was not unwarranted at the time the request for admission was made. The matter regarding which plaintiff sought defendant's admission was not completely free of controversy, and defendant had a reasonable basis for believing at the time that it might prevail on the issue of traffic safety at trial. MCR 2.313(C)(3). Accordingly, even though the circuit court ultimately found as a fact that there would be no serious traffic-related conse-

quences caused by plaintiff's proposed mining operation, the circuit court did not abuse its discretion by denying plaintiff's motion to sanction defendant for its failure to admit this fact. *Id.*; see also *Richardson, supra* at 457-458.

VII

Lastly, we wish to mention that the thorough and comprehensive nature of the circuit court's decision in this case has not escaped our attention. As this Court stated in *American Aggregates*, "the able and experienced trial judge has carefully weighed the evidence and furnished us findings which could be a model for trial judges to follow." *American Aggregates, supra* at 40.

Affirmed.

WHITBECK, P.J., concurred.

DAVIS, J. (*concurring in part and dissenting in part*). I concur in the majority's decision to affirm the trial court's denial of sanctions, but I respectfully dissent from the majority's decision to affirm the trial court's order permitting plaintiff's gravel mining notwithstanding defendant's zoning ordinance and the unique history of gravel mining in Kasson Township.

As the majority states, the salient facts of this case are not seriously disputed. Defendant Kasson Township is significantly underlain with gravel deposits. Between 1988 and 1994, the township as a whole experienced considerable internal strife brought about because of zoning and other legal battles waged by various entities concerning gravel mining, which included a public referendum on the subject. The township eventually resolved the problems by forming a gravel district after

this lengthy and public planning process. Plaintiff's property lies outside of, but adjacent to, the gravel district.

Plaintiff desires to have a portion of her property rezoned for gravel mining. The trial court found plaintiff entitled to mine gravel because the unique law that governs zoning as applied to the exploitation of natural resources requires that the exploitation be permitted unless "very serious consequences" will ensue. "We review the trial court's findings of fact in a bench trial for clear error and conduct a review de novo of the court's conclusions of law." *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). We review a trial court's decision whether to grant injunctive relief for an abuse of discretion. *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 105-106; 662 NW2d 387 (2003).

The law applicable to this question has its origins in a case that is almost 80 years old. In *North Muskegon v Miller*, 249 Mich 52; 227 NW 743 (1929), the city of North Muskegon discovered that there was oil within its limits and passed an ordinance forbidding oil drilling within its limits without a permit. The defendant owned a parcel of property that was zoned residential and applied for a permit, was repeatedly denied, and eventually commenced drilling anyway, whereupon the city commenced suit. It was significant to the discussion in the case that the defendant's property was a swampy wasteland that had been abandoned by the logging industry, and it was bordered on one side by the city's odiferous refuse dump and on another side by a primary water well for the city. It was undisputed too that the property was unsuitable for the residential purposes for which it was zoned. Therefore, the Court opined:

It will be readily seen that the property in question is almost worthless if its use is to be restricted as provided in the zoning ordinance. The courts have particularly stressed the importance of not destroying or withholding the right to secure oil, gravel, or mineral from one's property, through zoning ordinances, unless some very serious consequences will follow therefrom. *Village of Terrace Park v. Errett* [12 F2d 240 (CA 6, 1926), cert den 273 US 710 (1926)]. The effect of the zoning ordinance in the cause at issue amounts almost to a confiscation of the property. The legality of a zoning ordinance, when reasonable, has been long recognized by our courts. . . . It is, however, necessary that a zoning ordinance be reasonable, and the reasonableness becomes the test of its legality. [*North Muskegon, supra* at 57.]

Given the worthlessness of the property for any other purpose and the "lack of regard for the property" shown by the city itself, "the zoning ordinance as applied to the property in this case is unreasonable and confiscatory, and therefore illegal." *Id.* at 59. The drilling-permit ordinance, however, was upheld as reasonable given the proximity of the oil well to the city's water supply. *Id.* at 61-63.

The *Terrace Park* case, cited by our Supreme Court in *North Muskegon*, entailed property that could conceivably be used for residential purposes, and was only zoned for that purpose, but was vastly more suited to gravel extraction. *Terrace Park, supra* at 242-243. Although it was undisputed that gravel mining would devalue the surrounding properties somewhat, the *Terrace Park* court stressed that the specter of a constitutional "taking" loomed more ominously where a zoning ordinance precluded something that was fundamentally inherent in the land itself, as opposed to an ordinance precluding something that could be done elsewhere. *Id.* at 243. An example of the former was a rock quarry, and the latter a horse livery. *Id.* The court concluded that

the zoning ordinance at issue in that case was an unreasonable confiscation of the plaintiff's property because the area was already afflicted by unpleasant industry, so a gravel operation would not likely cause much additional bother. *Id.*

For many years, *North Muskegon* was cited as standing for the proposition "that a zoning ordinance that renders property almost worthless is unreasonable and confiscatory, and therefore illegal." *Ervin Acceptance Co v City of Ann Arbor*, 322 Mich 404, 408; 34 NW2d 11 (1948); see also, e.g., *Pleasant Ridge v Cooper*, 267 Mich 603, 606; 255 NW 371 (1934), *Hammond v Bloomfield Hills Bldg Inspector*, 331 Mich 551, 556; 50 NW2d 155 (1951), and *Bowman v Southfield*, 377 Mich 237, 248; 140 NW2d 504 (1966).

It was, however, cited for a different point by Justice BLACK in his "concurring" (but actually the majority) opinion in *Bloomfield Twp v Beardslee*, 349 Mich 296; 84 NW2d 537 (1957). That case again involved an allegedly confiscatory zoning ordinance that prevented the defendants from mining gravel on their property. *Id.* at 301-306. The defendants asserted that they had suffered a taking because they had a legal right to exploit natural resources, which must be performed where the resources are. *Id.* at 303. The Court explained in the "lead" opinion by Justice SMITH that

> [a]ttractive though the argument may seem upon its first reading, it must be obvious that a logical application of its principle would be destructive of all zoning. . . . [J]ust as the surface user desired by the owner must give way, at times, to the public good, as must the subsurface exploitation. In each case the question is whether, on the peculiar facts before us, the ordinance is a reasonable regulation in the interests of the public good, or whether it is an arbitrary and whimsical prohibition of a property owner's enjoyment of all of the benefits of his title. [*Id.* at 303.]

The "lead" opinion explained that the proper analysis was only one of reasonableness, citing *North Muskegon*, among other cases, for the proposition that there was no absolute bar in the law to prohibiting the exploitation of a valuable natural resource. It concluded that the overwhelmingly residential nature of the area, the deleterious effect thereon of gravel mining, and the remaining valuable use to which the defendants could put the property, made the zoning reasonable. *Bloomfield Twp, supra* at 304-305, 309-310.

Justice BLACK's majority "concurrence," however, agreed that the proposed mining was an enjoinable nuisance, but expressed "concern over the implications of zoning the depths distinguished from zoning the surface," and cited in support of that concern *Terrace Park* and *North Muskegon* for the different proposition that the right to exploit natural resources should not be zoned away in the absence of " 'very serious consequences' " should the zoning not be in place. *Id.* at 310-311. Subsequently, Justice BLACK again wrote a majority opinion concurring in part and dissenting in part with the "lead" opinion citing *North Muskegon*, and the citation therein to *Terrace Park*, as setting forth a "warning rule" of law that if a zoning ordinance that prohibits exploitation of a natural resource fails to meet the "test" that very serious consequences would ensue in the absence of the zoning, the courts "must" find the ordinance constitutionally unreasonable. *Certain-teed Products Corp v Paris Twp*, 351 Mich 434, 467; 88 NW2d 705 (1958).

Almost a quarter of a century later, in *Silva v Ada Twp*, 416 Mich 153; 330 NW2d 663 (1982), our Supreme Court returned to the issue of the standard for determining the constitutionality of zoning regulations that impede exploitation of natural resources. In *Silva*, our

Supreme Court "again reaffirm[ed] the 'very serious consequences' rule of [*North Muskegon*] and *Certain-teed*." *Id.* at 159. The Court explained that the reason zoning ordinances precluding natural-resource exploitation required greater justification than other zoning ordinances was because of the important public need for those resources and because resources can only be exploited where they actually exist. *Id.* at 159-160. The Court further noted that resource-bearing land could usually be put to some other purpose, resource extraction is usually temporary, and extraction can usually be regulated to minimize harm. *Id.* at 160-161. However, even zoning ordinances that preclude resource extraction remain presumptively reasonable, notwithstanding the higher standard; any individual challenging such an ordinance still bears the burden of rebutting that presumption. *Id.* at 162.

It is worth a brief digression to discuss zoning in general. Nine years before *North Muskegon* was decided, cities—and by implication in our Supreme Court's analysis, townships[1]—had no "inherent zoning power." *Clements v McCabe*, 210 Mich 207, 216; 177 NW 722 (1920). This conclusion was viewed with dismay by the Legislature, resulting in, among other reactions, the passage of 1921 PA 207, a zoning enabling act codified at 1929 CL 2633. See *Korash v Livonia*, 388 Mich 737, 741-742; 202 NW2d 803 (1972). A year before *North Muskegon*, our Supreme Court had acknowledged that the legislative and executive branches of Michigan's government had recognized that zoning laws served an important public policy, albeit one that required just compensation if property was taken as a consequence.

---

[1] *North Muskegon* involved zoning by a city, but *Bloomfield Twp*, *Certain-teed Products*, and *Silva*, wherein our Supreme Court relied on *North Muskegon*, involved zoning by townships.

*Johnstone v Detroit, G H & M R Co*, 245 Mich 65, 74-75; 222 NW 325 (1928). As discussed, *North Muskegon*, decided the next year, was at the time viewed as merely setting forth a rule of reasonableness, and was cited as such in an official note accompanying 1929 CL 2633.

Our Supreme Court endeavored to explain in unambiguous terms that "[o]ur laws have wisely committed to the people of a community themselves the determination of their municipal destiny, the degree to which the industrial may have precedence over the residential, and the areas carved out of each to be devoted to commercial pursuits." *Brae Burn, Inc v Bloomfield Hills*, 350 Mich 425, 431; 86 NW2d 166 (1957). In the absence of an affirmative showing of unreasonableness or arbitrariness sufficient to rebut "every presumption of validity" with which zoning ordinances are clothed, the courts do "not sit as a superzoning commission." *Id.* at 430-432. "We do not see the land, we do not see the community, we do not grapple with its day-to-day problems," and as such, short of a taking of constitutional magnitude or "the most extreme instances, involving clearly whimsical action," the courts are not in a position to adjudicate the wisdom of a community's efforts to address its own unique problems. *Id.* at 436-437. This was not a new pronouncement: again citing *North Muskegon* as setting forth reasonableness as the touchstone of a zoning ordinance's legality, our Supreme Court had emphasized 16 years before the *Brae Burn, Inc,* decision that "the court should not interfere with the judgment of a zoning board if there is a reasonable basis for its ruling." *Pere Marquette R Co v Muskegon Twp Bd*, 298 Mich 31, 36; 298 NW 393 (1941).

The "very serious consequences" rule applicable to zoning ordinances that affect natural resource extrac-

tion is, still, a matter of zoning, and it must be viewed in that context. When its history is considered, and when the public policy in this state of deference to zoning in general is also considered, it becomes apparent that defendant's gravel district is presumptively valid, that plaintiff has the burden of proving otherwise, and that the test is still fundamentally whether the zoning ordinance is confiscatory or arbitrary. The fact that a natural resource will be "locked up" in the ground if the gravel district is found valid is an important consideration in this analysis, but it is nevertheless only a part of that analysis. Put another way, the distinction between an "ordinary" zoning ordinance and a zoning ordinance that affects natural-resource exploitation is that the latter requires consideration of wider-scale social ramifications. In effect, the courts must determine whether the challenged zoning ordinance is confiscatory with regard to not only the landowner's desire to exploit the resources on his or her land, but also with regard to the community's need to have those resources exploited. It rationally follows that our analysis must also consider the negative implications to the community of exploitation, if contrary to the duly enacted zoning regulation.

In *American Aggregates Corp v Highland Twp*, 151 Mich App 37; 390 NW2d 192 (1986), this Court observed that our Supreme Court had not provided any firm guidelines for determining the existence of "very serious consequences," although it had made clear that "the degree and extent of public interest in the extraction of the specific natural resources located on the landowner's land is a relevant factor in reviewing the reasonableness of the zoning regulation." *Id.* at 43. Therefore, a "sliding scale approach" was necessary, because natural resources do not all "involve a constant high degree of public interest," and the only rational

way to determine the seriousness of a consequence was by comparing it to the benefits to be derived. *Id.* at 43-44. The lower the degree of public interest in the particular natural resource on the particular property at issue, the stronger a showing the landowner must make that no "very serious consequences" will ensue from the desired exploitation. *Id.* at 45-47. This Court then analyzed a variety of alleged harms that would occur in that particular case—also a gravel mining case—to surrounding properties, including noise from trucks, traffic-safety issues, decreased property values, and stunted residential development along the truck route because of the noise; this Court found the low public interest in the resource and the plaintiff's failure to prove no "very serious consequences" warranted upholding the zoning ordinance at issue. *Id.* at 47-51.

The *American Aggregates Corp* Court therefore properly recognized that the "very serious consequences" rule remains, consistent with any other zoning analysis, a test of reasonableness, albeit one that takes into account more factors than would ordinarily warrant consideration. Critically, however, this Court in *American Aggregates Corp* did not consider the kind of "very serious consequence" that is primarily at issue here: not merely the effect gravel mining will have on the immediately surrounding properties, but the effective dissolution of an entire community's legal framework specifically created to prevent itself from self-destructing. More particularly, the trial court's findings of fact included a discussion of the resulting expansion of gravel mining in the township if gravel mining was permitted on plaintiff's property. The trial court opined that the answer to "where does this end?" was that gravel mining would probably expand to natural boundaries: two national parks, another gravel-mining operation, a property owner who expressed no interest in

gravel mining, and areas that simply could not be mined profitably. In other words, the only effective limitations on transforming the entirety of Kasson Township into a gravel mine would be the existence of gravel on a given parcel of property and the property owner's own interest in mining.

Despite the trial court's factual findings above, the trial court found no "very serious consequences" because it believed *Silva* and *American Aggregates Corp* required it to make that finding. I believe that the trial court erred in relying too narrowly on these cases instead of fully considering the underlying legal principles involved. See *People v Stafford*, 434 Mich 125, 133-135; 450 NW2d 559 (1990). I believe that the majority likewise errs in ignoring or misconstruing the actual ramifications of the trial court's findings, particularly given defendant's history.

As the trial court recognized, the gravel district is the result of intensive planning efforts by defendant, with widespread community participation,[2] to arrest and avert its own destruction. The evidence showed considerable strife, animosity, and uncertainty brought about by both gravel mining per se and lawsuits brought seeking to permit or prevent mining, among other issues. In other words, the gravel district was formed to prevent precisely what the trial court found would occur—uncontrolled intrusion of mining into any part of the township that would support it, irrespective of the consequences to the community. The trial court also determined that the gravel on plaintiff's property, if

[2] Plaintiff and her now-late husband owned the property at issue in the township during this time and apparently did not seek to have it included in the gravel district until approximately eight years after the district's adoption. While not strictly relevant to the existence of "very serious consequences," this is illustrative of some of the ongoing uncertainty the gravel district was intended to prevent.

mined, would only "add modestly" to an existing gravel reserve that at worst would last "not much less" than "into the latter part of the 21st Century," and that "if this gravel wasn't ever mined we would survive just fine." The need for this particular gravel is therefore low, and the township has already gone to great lengths, with the involvement of its citizens, to *permit* gravel mining within its boundary in a managed and controlled manner. Under these circumstances, destruction or extensive disruption of the community itself— beyond harm to any particular parcel or parcels of property near the proposed mining—certainly constitutes a "very serious consequence." I, like the majority, find no clear error in the trial court's individual findings of *fact*. But the trial court and the majority fail to recognize that those facts constituted "very serious consequences."

Each and every zoning case must be analyzed on its own unique facts, so I would not hold anything more than that on the facts of *this* case, plaintiff *here* has failed to make the requisite showing that there are no very serious consequences attendant to conducting gravel mining on her property contrary to the township's zoning plan. I am definitely and firmly convinced that the trial court made a mistake in determining that plaintiff had shown that no very serious consequences would ensue from her proposed gravel mining. MCR 2.613(C); *Dep't of Civil Rights ex rel Johnson v Silver Dollar Cafe*, 441 Mich 110, 117; 490 NW2d 337 (1992). I would therefore reverse the trial court's order in plaintiff's favor. In view of the result I would reach, this Court would not need to determine whether plaintiff was entitled to costs as a prevailing party.

I agree with the majority that the trial court's refusal to impose sanctions should be affirmed. I would reverse

the trial court's order permitting plaintiff to conduct gravel mining in disregard of the zoning ordinance that the citizens of Kasson Township enacted to preserve their community from what will, as the trial court found, now occur.